

FILED

Nov 16 2017, 5:54 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kristina L. Lynn
Lynn and Stein, P.C.
Wabash, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine Cooper
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Kenny Purvis,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff* | November 16, 2017<br><br>Court of Appeals Case No.<br>09A02-1702-CR-454<br><br>Appeal from the Cass Superior<br>Court<br><br>The Honorable Richard A.<br>Maughmer, Judge<br><br>Trial Court Cause No.<br>09D02-1506-F5-53 |

**Baker, Judge.**

[1] Kenny Purvis appeals his convictions for Level 6 Felony Theft,[1] Level 6 Felony Conspiracy to Commit Theft,[2] and Level 5 Felony Corrupt Business Influence.[3] He contends that the evidence is insufficient to support his convictions and that the sentence imposed by the trial court was inappropriate in light of the nature of the offenses and his character. Finding sufficient evidence and that the sentence is not inappropriate, we affirm.

## Facts

[2] On May 9, 2015, an employee of the Walmart in Logansport found an empty cell phone box in the sporting goods aisle and notified Brady Herrington, an Asset Protection Officer, about the discovery. Herrington investigated and reviewed digital security footage from Walmart's security cameras. While watching the footage from earlier that day, he observed a member of a group of four individuals "quickly" grab the cell phone and conceal it underneath clothing in their shopping cart. Tr. Vol. II p. 42. Tracking the group's movement, Herrington observed members of the group, including two individuals later identified as Purvis and Adam Wakefield, select and conceal "multiple video games in the same method as the cell phone." *Id.* at 43. The individuals then exited the store without paying for the merchandise and drove away in a red truck. Based on their behavior and the manner in which they

---

[1] Ind. Code § 35-43-4-2(a)(1).

[2] Ind. Code § 35-41-5-2; I.C. § 35-43-4-2(a)(1).

[3] Ind. Code § 35-45-6-2(3).

concealed the merchandise, Herrington suspected that the group was involved in "Organized Retail Crime" and sent out a "BOLO" or "Be On Look Out" notification to other stores in the area. *Id.* at 37, 54.

[3] On May 15, 2015, another employee at the same Walmart discovered "a lot of empty . . . keeper boxes"[4] in the hardware aisle, hidden behind some light bulbs. *Id.* at 55, 69. Herrington reviewed the security footage for that day; he recognized Purvis from the prior incident and observed him grabbing multiple copies of the same game. At that time, Wakefield and another individual were with Purvis and, after taking the games, the group "split up" and took the games out of view of the cameras, near the hardware aisle. *Id.* at 60-61. Soon thereafter, Wakefield and the unidentified individual left; however, they returned less than twenty minutes later. The group took a labyrinthine route through the store before stopping at the hardware aisle "for a while[.]" *Id.* at 81. Another Asset Protection Officer, Amy Powers, testified that, based on her personal experience, their routes were unusual for most shoppers but "typical for shop lifting teams." *Id.* at 84. The individuals exited the Walmart and drove away in the same red truck from the first incident.

[4] On May 19, 2015, Powers recognized Purvis, Wakefield, and a woman, later identified as Charlene Reiner, pushing a cart filled with clothing through the

---

[4] Keeper boxes are plastic security cases containing magnetic strips that set off an alarm if the keeper boxes are not deactivated and removed before exiting the store. They are meant to deter theft and are commonly used to store "high theft items," such as video games, Blu-ray discs, DVDs, and SD cards. Tr. Vol. II p. 55, 108.

video game aisle. Based on her suspicions and experience, Powers contacted local police and followed Wakefield, who was pushing the cart. Before reaching the checkout or the exit, Wakefield was stopped and he, Purvis, and Reiner were escorted to the Asset Protection Office. Upon examining the cart, Powers discovered over $400 worth of electronics and video games hidden inside and under clothing. After interviewing all the individuals, the police searched each of them and discovered that Wakefield had four empty Walmart bags in his pockets. Soon thereafter, with Purvis's consent to search, the police discovered a Walmart bag containing eight copies of a newly released video game in his truck. The games in the truck retailed for $59.96 apiece and had just been released that day. While Purvis denied stealing from the Walmart, he admitted that he knew the games in the truck were stolen and that Wakefield told him he planned to steal from the Walmart.

[5] Subsequent investigation by the Logansport Police Department uncovered that Purvis offered and sold "a lot of video games" on an informal Facebook garage sale page. *Id.* at 140, 156; State's Ex. 6. The garage sale page contained multiple posts from Purvis's personal Facebook page advertising the sale of dozens of "unopened"—and sometimes "brand new"—video games at heavily discounted prices; some of the games still had Walmart stickers on them. Tr. Vol. II p. 140, 156. Several of Purvis's posts and messages to potential customers indicated that he could acquire specific games and he sometimes solicited other Facebook users, asking if they wanted a specific game.

Additionally, some of the sales occurred in the Logansport Walmart parking lot.

[6] On November 2, 2016, the State filed amended charges against Purvis including Level 6 felony theft, Level 6 felony conspiracy to commit theft, and Level 5 felony corrupt business influence. The State also alleged that Purvis was an habitual offender. Purvis's jury trial took place on January 4 and 5, 2017, and the jury found Purvis guilty of all charges. On January 6, 2017, Purvis admitted to being an habitual offender. On January 30, 2017, the trial court sentenced Purvis to six years for the corrupt business influence conviction and enhanced it by an additional six years because of Purvis's habitual offender status. For each of the remaining convictions, the trial court sentenced Purvis to a two-and-one-half-year term, each to be served concurrently with the corrupt business influence conviction. Thus, the trial court sentenced Purvis to an aggregate, executed sentence of twelve years imprisonment. Purvis now appeals.

# Discussion and Decision

## I. Sufficiency of the Evidence

[7] Purvis first argues that there was insufficient evidence to convict him of each charge. When reviewing challenges to the sufficiency of the evidence, we do not reweigh the evidence or judge the credibility of the witnesses. *Bond v. State*, 925 N.E.2d 773, 781 (Ind. Ct. App. 2010). Instead, we consider only the evidence most favorable to the verdict and the reasonable inferences drawn therefrom, and we will affirm if the evidence and those inferences constitute

substantial evidence of probative value to support the verdict. *Id.* Reversal is appropriate only when a reasonable trier of fact would not be able to form inferences as to each material element of the offense. *Id.*

# A. Theft

[8] To convict Purvis of Level 6 felony theft, the State was required to prove beyond a reasonable doubt that he "knowingly or intentionally exert[ed] unauthorized control over property of another person, with intent to deprive the other person of any part of its value or use," and that "the value of the property is at least seven hundred fifty dollars ($750) and less than fifty thousand dollars ($50,000)[.]" I.C. § 35-43-4-2(a)(1)(A).

[9] First, Purvis contends that there is no evidence that he left Walmart with any video games. However, it is undisputed that there is video evidence from May 9 and 15 showing Purvis and others quickly taking and concealing video games. State's Ex. 2-4. There is no evidence of Purvis or any of his cohort paying for any of these items or placing them back on the shelves before leaving Walmart. These circumstances alone would be sufficient to support the determination that Purvis knowingly or intentionally exerted unauthorized control over Walmart's property with an intent to deprive Walmart of the property's value. *See K.F. v. State*, 961 N.E.2d 501, 508 (Ind. Ct. App. 2012) ("[T]he theft statute does not require the State to prove that a defendant was found in possession of the stolen property or that the property was later recovered in order to find that a person committed theft."); *see also Hampton v. State*, 873 N.E.2d 1074, 1079 (Ind. Ct.

App. 2007) ("[A] criminal conviction may be based solely on circumstantial evidence.").

[10] Furthermore, the following evidence bolsters this conviction:

- On every occasion, Purvis and his team quickly grabbed and concealed the items, suggesting that they did not intend to buy the video games and that they did not want anyone to see them with the games. Tr. Vol. II p. 42.

- On May 15, Purvis was last seen with the concealed video games walking towards the hardware section and, later that day, an employee found nine empty keeper boxes in the same section.

- On May 19, after spending time in the video game aisle with Purvis and Reiner, Wakefield was found with four hidden Walmart bags and over $400 worth of electronics and video games concealed under and inside clothing in a shopping cart.

- Purvis's truck contained a Walmart bag with eight stolen copies of a video game that was released that day.

We find that the probative evidence and reasonable inferences drawn from the evidence could have allowed a reasonable factfinder to determine that Purvis knowingly or intentionally exerted unauthorized control over Walmart's property with an intent to deprive Walmart of the property's value.

[11] Next, Purvis contends that the State failed to demonstrate that the value of the stolen property equaled or exceeded $750. For the purpose of theft, the value of property is "the fair market value of the property at the time and place the offense was committed[.]" I.C. § 35-43-4-2(b)(1). Purvis argues that even

though there is evidence that he and his accomplices stole dozens of video games on May 9 and 15, the State failed to demonstrate which ones were stolen, making valuation of the video games speculative at best. *See Lane v. State*, 175 Ind. App. 543, 547, 372 N.E.2d 1223, 1226 (1978) (reversing conviction for theft of goods greater than a $100 value where the State failed to provide any evidentiary support for the value of the stolen goods).

[12] However, additional facts provide a sufficient basis for a factfinder to infer the $750 value. Herrington testified that, at the time of the theft, the video games found in Purvis's vehicle retailed for $59.96 apiece, meaning that the eight games had a fair market value of approximately $480. Tr. Vol. II p. 63. Considering that those games, which were released that day, were in or next to a Walmart bag and Purvis admitted that they were stolen, a reasonable factfinder could have inferred that Purvis stole these games from the Logansport Walmart.

[13] Furthermore, after Purvis, Wakefield, and Reiner were detained on May 19, Amy Powers testified that their cart contained eight games, retailing for approximately $400. *Id.* at 100. Considering the value of the games in the cart and the number of games that can be seen taken on the security footage from May 9 and 15, a reasonable factfinder could have inferred that the $400 worth of games was characteristic of the value of the games stolen on May 9 and 15. Lastly, Purvis, Wakefield, and Reiner were not required to leave the store to satisfy the material elements of theft, meaning that the value of the games found concealed in their cart is probative of the total value of the stolen goods.

Therefore, there was sufficient evidence to support the material element that the value of the stolen property equaled or exceeded $750.

[14] In sum, there was sufficient evidence to support Purvis's conviction for Level 6 felony theft.

## B. Conspiracy

[15] Next, Purvis argues that there was insufficient evidence to convict him of conspiracy to commit theft. "A person conspires to commit a felony when, with intent to commit the felony, the person agrees with another person to commit the felony" and "either the person or the person with whom he or she agreed perform[s] an overt act in furtherance of the agreement." I.C. § 35-41-5-2. "The State is not required to prove the existence of an express agreement[]" but there must be enough evidence to infer an agreement. *Kemper v. State*, 35 N.E.3d 306, 310 (Ind. Ct. App. 2015), *trans. denied*. "'It is sufficient if the minds of the parties meet understandably to bring about an intelligent and deliberate agreement to commit the offense.'" *Porter v. State*, 715 N.E.2d 868, 870-71 (Ind. 1999) (quoting *Williams v. State*, 274 Ind. 94, 96, 409 N.E.2d 571, 573 (1980)).

[16] Here, Purvis and Wakefield were together during each trip to Walmart. They stole the same types of items, concealed them in the same manner and location, and came and left together in the same vehicle. A reasonable factfinder could infer an understanding or agreement to commit felony theft from this degree of coordination. *See, e.g.*, *Phares v. State*, 506 N.E.2d 65, 68 (Ind. Ct. App. 1987) (jury could infer an agreement from acts demonstrating the use of tactics and

planning).  Further, Purvis does not dispute that the concealment of the games was an overt act in furtherance of stealing the games.  Accordingly, there was sufficient evidence to support Purvis's conviction for Level 6 felony conspiracy to commit theft.

## C.  Corrupt Business Influence

[17]  To convict Purvis of Level 5 felony corrupt business influence under Indiana's Racketeer Influenced and Corrupt Organizations (RICO) Act,[5] the State was required to prove that he was "employed by or associated with an enterprise, and . . . knowingly or intentionally conducts or otherwise participates in the activities of that enterprise through a pattern of racketeering activity[.]"  I.C. § 35-45-6-2(3).

[18]  First, we must determine whether Purvis was associated with an "enterprise," which is defined, among other things, as "a union, an association, or a group, whether a legal entity or merely associated in fact."  I.C. § 35-45-6-1(c)(2).  "[T]he hallmark of an enterprise is structure. . . . A RICO enterprise is an ongoing group of persons 'associated through time, joined in purpose, and organized in a manner amenable to hierarchical or consensual decision-making.'"  *Miller v. State*, 992 N.E.2d 791, 794 (Ind. Ct. App. 2013) (quoting *United States v. Rogers*, 89 F.3d 1326, 1337 (7th Cir. 1996)).[6]  Additionally,

---

[5] I.C. ch. 35-45-6.

[6] Though the federal RICO Act and Indiana's RICO Act are distinct, *see Jackson v. State*, 50 N.E.3d 767, 769 (Ind. 2016), we have noted that relatively "little has been written in Indiana upon the definition of

because a RICO enterprise is more than a group who got together to commit a pattern of racketeering activity, there should be sufficient evidence to infer that the group is an "'organization with a structure and goals separate from the predicate acts themselves.'" *Stachon v. United Consumers Club, Inc.*, 229 F.3d 673, 675 (7th Cir. 2000) (quoting *United States v. Masters*, 924 F.2d 1362, 1367 (7th Cir. 1991)).

[19] We find that Purvis's group was an enterprise for the purposes of RICO. The thefts were joined in time and purpose: within the span of three weeks, Purvis and at least two others met and stole primarily video games from the same location on at least three separate occasions. The group acted in a manner that was amenable to hierarchal decision-making because Purvis was the one providing transportation, selling games on the garage sale page, and interacting with and soliciting customers—he was in a strong position to direct the group's efforts towards certain items and actions. *See, e.g.*, *Waldon*, 829 N.E.2d at 176-77 (finding a RICO enterprise where defendant recruited three juveniles to commit a series of burglaries, he provided transportation, they had a consistent method in how they performed the crimes, and they made "regular . . . attempts at burglary[]"). Further, there is sufficient evidence from which a reasonable factfinder could have inferred a "structure and goals separate from the predicate acts . . . ." *Stachon*, 229 F.3d at 675. The State produced twelve pages of

---

'enterprise,'" *Waldon v. State*, 829 N.E.2d 168, 176 (Ind. Ct. App. 2005), *disapproved on other grounds by Jackson*, 50 N.E.3d at 774-75, and we have observed that "federal cases concerning the general construction of the Act are instructive," *Miller*, 992 N.E.2d at 794.

Purvis's Facebook posts selling apparently new and unopened games. State's Ex. 6. The earliest post was created on December 15, 2014, and the posts extend to May 9, 2015. Some of the games in the posts have Walmart stickers on them and many are priced at half off their retail value. In sum, a reasonable factfinder could have inferred that the group stole the games, not simply to obtain the games, but for the ultimate goal of reselling them for profit.

[20] Second, we must determine whether Purvis engaged in "racketeering activity," which means "to commit, to attempt to commit, to conspire to commit a violation of, or aiding and abetting in a violation" of any of the listed offenses, including theft. I.C. § 35-45-6-1(e)(14). As explained above, there was sufficient evidence to support Purvis's conviction for theft. In other words, there was sufficient evidence to support the determination that Purvis engaged in racketeering activity because he committed multiple thefts.

[21] Third, we must consider whether Purvis's behavior amounted to a "pattern of racketeering activity," which is defined as "engaging in at least two (2) incidents of racketeering activity that have the same or similar intent, result, accomplice, victim, or method of commission, or that are otherwise interrelated by distinguishing characteristics that are not isolated incidents. . . ." I.C. § 35-45-6-1(d). Our Supreme Court recently explained that:

> [T]he statute does not apply to sporadic or disconnected criminal acts. Thus, although failure to prove continuity [of the acts] is not necessarily fatal to a corrupt business influence conviction—since it is not a separate element in the statute—the State must still demonstrate that the criminal incidents were in fact a

"pattern" and not merely "isolated" incidents. And evidence of a degree of continuity or threat of continuity is certainly helpful in establishing the necessary "pattern."

*Jackson*, 50 N.E.3d at 775-76 (footnote omitted).

[22] We find that a reasonable factfinder could conclude that Purvis's conduct constituted a pattern of racketeering activity. The thefts had a common intent—to steal and resell video games. During each theft, Purvis acted with multiple accomplices. Purvis used the same method to commit each theft—concealing video games under a pile of clothes in a shopping cart—and stole from the same victim. Purvis also drove most, if not all, of the group to and from Walmart in the same vehicle. Considering these common threads, we conclude that the evidence was sufficient to establish that Purvis's conduct was a "pattern of racketeering activity" and not sporadic, unrelated, or isolated incidents. I.C. § 35-45-6-1(d).[7]

[23] Purvis relies on *Robinson v. State*, 56 N.E.3d 652 (Ind. Ct. App. 2016), *trans. denied*, in contending that Indiana's RICO Act does not apply to him. In *Robinson*, Robinson and his fiancée visited a local Walmart. The two split up and Robinson went to the electronics department. He quickly selected a home security camera and went to the men's apparel section, leaving soon thereafter

---

[7] We do not mean to suggest, by listing a common intent, result, accomplice, victim, and method of commission, that the statutory definition of "pattern of racketeering activity" requires that all or even most of these factors be satisfied.

without the camera. *Id.* at 654-55. Robinson and his fiancée then met up and left the store; several hours later employees found the camera box, which was missing several parts. Nearly three weeks later, the two returned to the same Walmart and began repeating the same steps as the previous visit. However, after a store employee spotted Robinson opening a box of the same type of security camera, police were called and Robinson was arrested and charged with several offenses, including Level 5 felony corrupt business influence. A jury ultimately convicted Robinson of, among other things, corrupt business influence. *Id.* at 655.

[24] Robinson appealed and this Court reversed his corrupt business influence conviction. In reasoning that Indiana's RICO Act did not apply to Robinson, this Court observed:

> Here, Robinson twice shoplifted or attempted to shoplift similar items from the same Walmart store. Beyond that, there is no evidence of any kind of ongoing criminal enterprise. There is no evidence of Robinson having acquired any property through "racketeering activity" other than the items he stole or attempted to steal from Walmart. There is no evidence of extensive planning or increasing sophistication of Robinson's crimes. There is no evidence he enlisted any accomplices to work with him; the record does not contain any evidence that [Robinson's fiancée] was aware of Robinson's criminal actions, and she denied having any knowledge of them. Robinson was not any kind of criminal mastermind, nor did he work for one. The crimes were isolated and sporadic.

*Id.* at 659. The Court also noted that Robinson and his crimes were not the type of person or activity that the General Assembly intended to be covered by the RICO Act. *Id.* at 659-60.

The facts of the present case are clearly distinguishable from *Robinson*. As noted earlier, Purvis stole or attempted to steal dozens of games to resell them for profit—he did not steal a game or two simply to play them at home. Unlike Robinson, Purvis acted in concert with a cohort of accomplices who were not only aware of Purvis's goals but actively assisted him in achieving them. On every occasion, Purvis was accompanied by at least one other person and sometimes as many as three others. Purvis and his accomplices also demonstrated significant planning and sophistication in executing their crimes: they came to the video game section with a ready-made place to conceal the games; they hid the games across the store, returning later to retrieve them; they knew about the keeper boxes and came prepared to remove them; and their movements demonstrated forethought because the group regularly split up after concealing the games and took circuitous routes through the store in a manner that was typical for "shop lifting teams." Tr. Vol. II p. 84. For these reasons, we have little difficulty in distinguishing the present case from *Robinson* or in finding that Indiana's RICO Act applies here.[8]

---

[8] Purvis also contends that his "conduct is not the type of crime that the RICO Act is intended to punish." Appellant's Br. p. 12. To the extent that he relies on *Robinson* for this proposition, we have discussed why his situation is distinguishable from that case. Notwithstanding that point, we find that his conduct satisfied the

[26] In sum, there was sufficient evidence to establish that Purvis was associated with an enterprise, and knowingly or intentionally participated in the activities of that enterprise through a pattern of thefts. In other words, there was sufficient evidence to support Purvis's conviction for corrupt business influence.

## II. Appropriateness of Sentence

[27] Finally, Purvis argues that the sentence is inappropriate in light of the nature of the offenses and his character. Indiana Appellate Rule 7(B) provides that this Court may revise a sentence if it is inappropriate in light of the nature of the offense and the character of the offender. We must "conduct [this] review with substantial deference and give 'due consideration' to the trial court's decision— since the 'principal role of [our] review is to attempt to leaven the outliers,' and not to achieve a perceived 'correct' sentence . . . ." *Knapp v. State*, 9 N.E.3d 1274, 1292 (Ind. 2014) (quoting *Chambers v. State*, 989 N.E.2d 1257, 1259 (Ind. 2013)) (internal citations omitted).

[28] Purvis was convicted of three crimes. The sentencing options and outcomes for each conviction are as follows:

- He was convicted of one Level 5 felony, for which he faced a sentence of one to six years, with an advisory term of three years. Ind. Code § 35-50-2-6(b). He received a six-year term, which was enhanced by six years because of his habitual offender status. I.C. § 35-50-2-8(i)(2) (for a person

---

clear, unambiguous language of the statute, which is the best indicator of legislative intent. *See Day v. State*, 57 N.E.3d 809, 812 (Ind. 2016).

convicted of a Level 5 or 6 felony, minimum enhancement is two years; maximum enhancement is six years).

- He was convicted of two Level 6 felonies, for which he faced a sentence of six months to two and one-half years, with an advisory term of one year. I.C. § 35-50-2-7(b). For each count, he received a two and one-half year term, to be served concurrently with the Level 5 conviction.

Thus, the trial court imposed an aggregate, fully-executed sentence of twelve years imprisonment, with credit for twenty-five days served. Had the trial court imposed maximum, fully consecutive terms on all convictions, Purvis would have received an aggregate term of seventeen years.

[29] With respect to the nature of Purvis's offenses, Purvis actively participated with a group to steal and resell video games on a large scale. The trial court found that Purvis was the "leader" of the group, and there is no doubt that he played an instrumental role in the offenses by providing transportation, aiding in the concealment of the games, and soliciting and conducting resales. Tr. Vol. II p. 222. Purvis argues that the loss to Walmart was minimal, considering its size and the fact that it did not seek restitution. However, the size of the store does not negate the severity of his crime. Further, the evidence demonstrates that Purvis and his cohort stole or attempted to steal at an alarming rate (at least $800 worth of video games in a ten-day span) and showed no indication of slowing down. Many of the games from the earlier Facebook posts still had Walmart stickers on them and a reasonable factfinder could have inferred, based on all these circumstances, that the three incidents in May 2015 were not the only times that Purvis and his accomplices stole from Walmart.

[30]     With respect to Purvis's character, he concedes that he has multiple prior felony convictions, including: Class B felony dealing in methamphetamine; Class C felony burglary; Class D felony theft; Class D felony aiding, inducing, or causing theft; and Class D felony possession of marijuana; as well as two misdemeanor convictions and three adjudications as delinquent. Appellant's Confidential App. p. 6-9. Despite his considerable criminal history, Purvis contends that "his record is certainly not the worst of the worst." Appellant's Br. p. 22. However, it is undisputed that, although Purvis received the maximum sentence on every conviction and the maximum habitual offender enhancement, he will not serve the maximum possible sentence because his sentence for each of the two Level 6 counts will be served concurrently to the Level 5 term. *See Wells v. State*, 904 N.E.2d 265, 274 (Ind. Ct. App. 2009) ("The maximum possible sentences are generally most appropriate for the worst offenders."). While he also claims to have a close relationship with his family, he provides no reason why this mitigates any of his behavior. Purvis's record reveals that he has failed to take advantage of numerous chances to learn from his mistakes—including an earlier conviction for felony theft—and his history demonstrates an unwillingness or an inability to conform his behavior to the rule of law.

[31]     In sum, we do not find the sentence imposed by the trial court to be inappropriate in light of the nature of the offenses or Purvis's character.

[32]     The judgment of the trial court is affirmed.

Bailey, J., and Altice, J., concur.