## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 14 2019, 6:31 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Darren Bedwell
Marion County Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Justin F. Roebel
Supervising Deputy
Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Jaquisha Love,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | March 14, 2019<br><br>Court of Appeals Case No.<br>18A-CR-1410<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Mark D. Stoner, Judge<br><br>Trial Court Cause No.<br>49G06-1608-MR-31799 |

**Robb, Judge.**

# Case Summary and Issues

[1] Following a jury trial, Jaquisha Love was convicted of the murder of Dayron Staten, and the attempted murders of Anya West, Valencia Standberry, Mark May, Antonio Turner, and Antonio Trotter, as well as armed robbery and carrying a handgun without a license. The trial court sentenced Love to an aggregate sentence of 130 years in the Indiana Department of Correction. This case presents two issues for our review: (1) whether Love's attempted murder convictions are supported by sufficient evidence that Love had the specific intent to kill West, May, Turner, and Trotter; and (2) whether Love's sentence is inappropriate in light of her character and the nature of the offenses. Concluding there is sufficient evidence to support Love's attempted murder convictions and her sentence is not inappropriate in light of her character and the nature of the offenses, we affirm.

# Facts and Procedural History[1]

[2] On the night of July 18 and early morning of July 19, 2016, officers of the Indianapolis Metropolitan Police Department ("IMPD") responded to four scenes resulting from a crime spree involving Zion Smith and Love. First, the two robbed West at gunpoint and Smith fired several shots at West as she ran

---

[1] We held oral argument in this case on February 12, 2019, at Indiana State University in Terre Haute, Indiana. We thank the students, faculty, and staff of the Political Science Department for the gracious reception and counsel for their able advocacy.

away. Second, Love arranged a meeting to discuss a trade with Staten, who indicated he was selling a handgun. About an hour after the first incident, police found a car with Staten dead in the front driver's seat and Standberry in the front passenger seat bleeding from a gunshot wound. Several hours later, Love and an unidentified man showed up at May's home. May, Turner, and Trotter were all shot but survived their injuries. When May shot at the male shooter, the shooter fled the scene. Lastly, after the home invasion, police were called to a home where they found Smith and Love, with Smith suffering from a gunshot wound to the eye. Each incident is discussed in greater detail below.

## Gale Street Shooting of Anya West

[3]    On the evening of July 18, Smith and Love were at Tamara Johnson's house on East 12th Street in Indianapolis. Johnson's daughter, Makayla, was Smith's girlfriend. After dark, the two left to meet with West to "hang out[.]" Transcript, Volume II at 234. West was a close friend of Love's and the two had just started talking again after a disagreement. In fact, West's contact information in Love's phone was labeled "Ex Friend" on July 5, but that was later deleted and replaced by West's nickname, "Veego." Exhibits, Vol. 3 at 6; Tr., Vol. II at 231. Smith and Love met West at Brookside Park and they walked to West's house, three or four blocks away. While walking and discussing the plans for the night, Love asked West to get her .22 caliber handgun. Upon arriving at West's house, Love and Smith waited outside while West went inside to change clothes and retrieve her gun.

[4] Love, Smith, and West then began to "walk the neighborhood like [they] usually do" and headed back toward the park. Tr., Vol. II at 241. While walking up Gale Street, Smith told West he had a .45 caliber handgun for sale and the two exchanged their guns as if they were "playing show and tell[.]" *Id*. at 242. West thought Smith was "playing around" with the gun and he fired a shot at West's foot. *Id*. As the two went to trade their guns back, Smith "snatched [West's] gun out of [her] hand[,]" pointed the gun at West's head, and told her that "it was his gun now." *Id*. at 243-44. West asked Love whether she was "going to let him rob [her] like that?" *Id*. at 244. Love responded that "it ain't got nothing to do with [me]." *Id*. At that point, Smith still had the gun pointed at West's head and threatened to shoot her. Smith then directed Love to check West's pockets. Love complied and found "Sweet Tart xannies[,]" which are Xanax pills shaped like Sweet Tart candy. *Id*. at 245. West pushed Love away and ran through the opening of a fence, into her backyard, and to the front door of her house. As West was running, Smith fired three or four shots at her with the .45 caliber handgun, resulting in a bullet hole in her shirt and jacket. Police received two 911 calls at 10:55 p.m. and 10:57 p.m. about the shooting.

[5] West remained in her home for ten to fifteen minutes. She was angry and quarreled with a housemate, so she decided to go for a walk around the neighborhood. During her walk, she saw Love and Smith walking up the street, so she hid on a nearby front porch until they passed. Love and Smith

were both carrying guns and headed toward LaSalle Street. West believed Love was carrying her .22 caliber handgun.

## Robson Street Shooting of Dayron Staten and Valencia Standberry

[6] The same evening, Staten sent out text messages and photos indicating that he was attempting to sell a 9mm handgun. *See* Exhibits, Vol. 3 at 32-35. Love called Staten to arrange a meeting to discuss a "trade[.]" Tr., Vol. III at 243. Staten had been friends with Smith and Love. Staten and Love had been close friends and Love was identified in Staten's phone as "Sis," Exhibits, Vol. 3 at 22, but the two had a "fall out" weeks earlier and were not speaking.[2] Tr., Vol. III at 204, 219.

[7] Staten, his girlfriend Standberry, and his friend Jevon Butler left Staten's house on Tuxedo Street and drove to Dearborn Street to meet Smith and Love. However, Love and Smith were not there when they arrived. Staten called Love and she told him to meet them on Olney Street. Staten, Standberry, and Butler went to Olney Street, but Love and Smith failed to arrive, so they returned to the house on Tuxedo Street.

---

[2] Love and Staten's mutual friend, Pashae Beech, testified that she referred to Love as her "little sister" and to Staten as her "little brother." Tr., Vol. III at 214-15. Beech has known Love since she was twelve or thirteen and Love had lived with Beech's brother after Love's mother passed away. Love was dating Beech's little sister and Staten's sister was dating Beech's brother.

[8] Staten and Love then exchanged a series of text messages. At 11:42 p.m., Staten sent Love a text asking "We're [sic] u at[.]" Exhibits, Vol. 3 at 14. At 11:54 p.m., Love texted Staten, "Where u at[,]" and Staten replied, "I'm at the crib[.]" *Id*. Staten and Standberry then left the house to go "around the corner to go do a tradeoff." Tr., Vol. III at 244. Phone records indicate that Love called Staten at 11:55 p.m. and 12:01 a.m. *See* Exhibits, Vol. 3 at 20. At 12:08 a.m. and 12:14 a.m. on July 19, police received 911 calls about a suspicious vehicle and shots fired at the intersection of Robson Street and LaSalle Street. Police arrived at the scene to find Standberry's red Kia Rio in the street with the lights on and rear driver's side door open. Police found Staten dead in the front driver's seat and Standberry in the front passenger seat bleeding from a gunshot wound to her neck.

[9] Staten had three gunshot wounds, one in the chest and two to his head and neck. An expert testified at trial that bullet fragments recovered from Staten's autopsy were fired from a 9mm handgun. *See* Tr., Vol. VI at 84. Standberry had been shot four times, but ultimately survived. She was shot in the neck, arm, hand, and mouth. The bullet that went through her neck also went through her spine. As a result, she was in a coma for a period of time and is now a paraplegic with no feeling from the waist down. She testified at trial but has no memory of the day of the shooting.

[10] When the medics removed Standberry from the vehicle, a .40 caliber Arms CM40 handgun fell out of the passenger side door. Officers found five spent casings outside of the vehicle and three fired casings inside the vehicle, as well

as metal fragments. A firearms examiner concluded that four of the casings were from a .22 caliber Winchester Super X rounds, long or long rifle cartridges, and were all fired from the same firearm. The other four shell casings were fired from the 9mm handgun, which was later recovered at the Wallace Avenue scene. Smith's palm print was identified on the driver's rear door frame. Tr., Vol. IV at 93. Standberry testified that she had only briefly met Smith and Love once before July 2016 when she drove to Staten's friend's house to pick Staten up. At that time, neither Smith nor Love ever came near or got into her vehicle.

## Wallace Avenue Shooting of Mark May, Antonio Turner, and Antonio Trotter

[11] At 3:35 a.m., 911 received two calls regarding a shooting at a house in the 1400 block of Wallace Avenue in Indianapolis. Mark May and his girlfriend, Pamela Coomer, lived in the house and Gary Cooper lived in an apartment upstairs. On the night of July 18-19, May's friend Antonio Trotter was visiting. Cooper, Coomer, and Trotter's son, Antonio Turner, were also present.

[12] Someone came to the side door of the house, and either Coomer or Trotter answered the door. Trotter recognized Love "[f]rom the neighborhood" and testified he had seen her before. Tr., Vol. IV at 64. He testified that she was with a "young guy" and the two came in the house. *Id*. at 61. Turner was in the bathroom and Trotter knocked on the bathroom door to let him know someone was at the door. As Turner approached the side door, he was "immediately" shot. Tr., Vol. V at 91. He was shot four times in the leg, once

in his arm, and once in his finger. Turner testified that he did not see the person who shot him. *See id.* Turner took his pants off because they were heavy and he ran to the back room.[3] Turner left the back room door open and tried to get a shotgun but was unable to lift it due to his injuries.

[13] Once Turner reached the side door, May testified that "all the sudden it was nothing but gunfire," Tr., Vol. IV at 35, and stated it was as if "the 4th of July started." *Id.* at 33. May ran into his bedroom, shut the door, blocked the door with furniture, and instructed Coomer to call 911. May armed himself with a revolver and left the bedroom ten minutes later. He walked into the hallway to the living room where he observed Trotter on the couch. As May stepped into the kitchen, someone jumped out from behind the stove and shot at him twice. One of the shots shattered May's pelvis and he fell back into the hallway.[4] Turner heard May yell that he was shot. Tr., Vol. V at 95.

[14] The intruder then shot Trotter in the chest and Trotter called out to his son, "Little Tone, I'm hit." Tr., Vol. IV at 44. May testified that the intruder pointed the gun at Trotter's head as if he planned to shoot Trotter again, but he was able to shoot the intruder first and said the "only thing I could see was the

---

[3] Turner had three thousand dollars in cash on his person at the time.

[4] At trial, May testified that his pelvis was "completely shattered" and he now walks with a cane as a result. Tr., Vol. IV at 42.

ghost come [sic] out of his eye like he was surprised. The gun went flying out of his hand and that was all." *Id*. at 44-45. The intruder then fled the house.

[15] Turner heard May say, "I shot him" and went into the living room where he found the intruder's 9mm handgun on the floor and kicked it to May, who put the gun and his revolver into a cupboard. Tr., Vol. V at 97. At 3:35 a.m., 911 received a call reporting that someone had been shot at the Wallace Avenue house. Minutes later, at 3:40 a.m., an officer arrived and discovered the side door open and bullet casings on the ground, heard shouting, and found wounded people inside.

[16] Officers recovered the 9mm handgun and revolver and discovered a .45 caliber handgun on the kitchen floor. Smith's fingerprints were found on the slide of the .45 caliber handgun. Forensic testing of a fragment of the bullet removed from May's body during surgery revealed that the bullet had been fired from the recovered .45 caliber handgun, the same handgun Smith had used to rob Anya West. *See* Tr., Vol. VI at 88-89. Unfired bullets and shell casings from fired bullets were discovered in and around the house. Police found broken pieces of a magazine for a .40 caliber Springfield Armory handgun, casings from two .40 caliber bullets, casings from three 9mm bullets, casings from two .45 caliber bullets, and a casing from one .357 bullet.

[17]     Trotter and Turner both stated *two* people were at the door, one of whom Trotter identified as Love.[5]  Turner testified that only one person was shooting, but neither were able to account for what Love was doing during the shooting. May, Trotter, and Turner all survived their injuries.  Later, Trotter identified Love from a photo array.  When shown a photo array containing Smith, Trotter identified another person as the shooter, but police later concluded he was not involved in the incident.  May and Turner were each shown a photo array containing Smith and another containing Love, but neither were able to identify Love or Smith from the array.

## Arrests on East 12th Street

[18]     Between 3:30 a.m. and 4:15 a.m., Smith and Love returned to Johnson's house on East 12th Street, less than one mile from the scene of the Wallace Street shooting.  At 4:16 a.m., Johnson called 911 to report a person with an eye injury and severe bleeding.  When police arrived, Johnson escorted them to the basement, where Love and Smith were.  Smith was pacing, covering his eye, and "wincing in pain."  Tr., Vol. IV at 239.  Smith appeared to have a gunshot wound to his left eye and medics took Smith out of the house.  IMPD Detective Garland Cooper, who had just left the scene of the Wallace Street shooting, searched for Smith's identification in the pockets of a pair of pants on the floor and discovered a live round of ammunition.  Detective Cooper removed

---

[5] Turner was not able to give a description of either of the two people who were at the door.

everyone from the house and requested detectives. In a subsequent search of the basement, officers found an unfired .22 caliber Super X cartridge in a couch, an unfired .45 cartridge on the floor, another unfired .45 cartridge in a box, and an ammunition box with an ammunition tray. Smith's fingerprint was later identified on the ammunition tray.

[19] At trial, the State presented evidence that on July 5, 2016, two weeks before the shooting, Love fired a .45 caliber handgun near the intersection of 10th Street and Rural Street in Indianapolis. A firearms examiner identified the casings from the July 5 incident as having been fired from the .45 caliber handgun recovered at the Wallace Avenue shooting and used in the Gale Street shooting.

[20] On August 12, 2016, the State charged Love with the following: Count I, murder, a felony; Counts II-VI, attempted murder, all Level 1 felonies; Count VII, armed robbery, a Level 3 felony; and Count VIII, carrying a handgun without a license, a Class A misdemeanor. Love and Smith were tried together and a jury found Love guilty of all counts against her. *See* Tr., Vol. VI at 163-65.

## Sentencing Hearing

[21] The trial court held a sentencing hearing on May 23, 2017. Love presented testimony from Dr. James Henry, who performed a trauma assessment on Love and testified about the juvenile trauma Love experienced and its impact on her

cognitive and emotional development. The trial court identified Love's age[6] and "traumatic upbringing" as mitigators and the significant violence of the offenses and the fact that there were multiple victims, including one who is now paralyzed, as aggravators. *Id.* at 246, 249. Love was sentenced to the following: fifty years for the murder of Staten to be served consecutively to thirty years for the attempted murder of Standberry; thirty years for the attempted murders of Turner, Trotter, and May to be served concurrently with each other but consecutively to the other sentences; and twenty years for the attempted murder of West to be served concurrently with three years for the armed robbery of West but consecutively to the other sentences. *See* Tr., Vol. VII at 3-4. The trial court merged Love's conviction for carrying a handgun without a license with Counts I through VI, thus no additional sanction was imposed. Love's sentence totals 130 years. Love now appeals.

# Discussion and Decision

## I. Sufficiency of the Evidence

### A. Standard of Review

[22] When reviewing the sufficiency of the evidence required to support a criminal conviction, we do not reweigh the evidence or judge the credibility of the witnesses. *Purvis v. State*, 87 N.E.3d 1119, 1124 (Ind. Ct. App. 2017). We

---

[6] Love was eighteen years old at the time the offenses were committed and twenty years old at the time of the sentencing hearing.

consider only the evidence most favorable to the verdict and any reasonable inferences drawn therefrom. *Id.* When confronted with conflicting evidence, we must consider it "most favorably to the trial court's ruling." *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007) (internal quotation omitted). This court will affirm "if there is substantial evidence of probative value such that a reasonable trier of fact could have concluded the defendant was guilty beyond a reasonable doubt." *Bailey v. State*, 907 N.E.2d 1003, 1005 (Ind. 2009).

## B. Attempted Murder

[23] Love challenges four of her five attempted murder convictions. The State bears the burden of proving all elements of the charged crime beyond a reasonable doubt. *Taylor v. State*, 587 N.E.2d 1293, 1301 (Ind. 1992); Ind. Code § 35-41-4-1(a) ("A person may be convicted of an offense only if his guilt is proved beyond a reasonable doubt."). A person who "knowingly or intentionally kills another human being" commits murder, a felony. Ind. Code § 35-42-1-1(1). Indiana's attempt statute states: "A person attempts to commit a crime when, acting with the culpability required for commission of the crime, the person engages in conduct that constitutes a substantial step toward commission of the crime. An attempt to commit a crime is a felony or misdemeanor of the same level or class as the crime attempted. However, an attempt to commit murder is a Level 1 felony." Ind. Code § 35-41-5-1(a).

[24] A conviction for attempted murder requires proof that the defendant had the specific intent to kill. *Spradlin v. State*, 569 N.E.2d 948, 949 (Ind. 1991). Under

Indiana's accomplice liability statute, a person "who knowingly or intentionally aids, induces, or causes another person to commit an offense commits that offense[.]" Ind. Code § 35-41-2-4. To convict a defendant for attempted murder under accomplice liability also requires the State to prove the defendant, "with the specific intent that the killing occur, knowingly or intentionally aided, induced, or caused his accomplice to commit the crime of attempted murder." *Bethel v. State*, 730 N.E.2d 1242, 1246 (Ind. 2000). Thus, when the State seeks to convict a defendant of attempted murder on an accomplice liability theory, it must prove: "(1) that the accomplice, acting with the specific intent to kill, took a substantial step toward the commission of murder, and (2) that the defendant, acting with the specific intent that the killing occur, knowingly or intentionally aided, induced, or caused the accomplice to commit the crime of attempted murder." *Id.*

[25] Accomplice liability applies to the contemplated offense, as well as all acts that are a probable and natural consequence of the concerted action. *Wieland v. State*, 736 N.E.2d 1198, 1202 (Ind. 2000). The jury was instructed that Love could be convicted as an accomplice. *See* Appellant's Appendix, Volume III at 201-05. To determine whether a defendant aided another in the commission of the crime, the fact-finder considers: (1) presence at the crime scene; (2) companionship with another engaged in a crime; (3) failure to oppose the commission of the crime; and (4) the course of conduct before, during, and after the occurrence of the crime. *Wright v. State*, 950 N.E.2d 365, 368 (Ind. Ct. App. 2011). As a general rule, mere presence at the scene of the crime is not itself

sufficient to allow an inference of participation in the crime. *Griffin v. State*, 413 N.E.2d 293, 295 (Ind. Ct. App. 1981). Such presence may, however, be considered with other evidence as a factor in determining a defendant's guilt. *Id*.

## C. Anya West

[26] Love first challenges the sufficiency of the evidence of the attempted murder of West in the Gale Street shooting. Love concedes her participation in the robbery of West. However, she argues "the evidence does not support the inference that [she] aided, induced, or caused Smith to shoot at West." Brief of Appellant at 23.

[27] Viewed most favorably to the trial court's judgment, the evidence demonstrates that Love and West planned to meet that evening and Love asked West to retrieve her .22 caliber handgun. Smith told West he had a .45 caliber handgun for sale and the two exchanged their guns and Smith fired a shot at West's foot. The two went to trade their guns back and when Smith received his gun, he took West's gun out of her hand, pointed the gun at her head, and told her that it was now his gun. When West asked Love whether she was going to let Smith rob her, Love responded that "it ain't got nothing to do with [me]." Tr., Vol. II at 244. With the gun still pointed at West's head, Smith instructed Love to check West's pockets and Love discovered Xanax pill candies. West then pushed Love away and ran down the street. As West ran away, Smith fired three or four shots at her with the .45 caliber handgun, resulting in a bullet hole through her shirt and jacket.

Love points out that it was Smith, not her, who fired the shots at West, and admits that the evidence supports a robbery conviction, but not that she had the specific intent to kill West. She claims the record is silent as to whether she aided, induced, or caused Smith to shoot at West. On the other hand, the State argues that the evidence demonstrates that Love was working in concert with Smith as he threatened to kill West and a jury could infer that the two "had agreed that the robbery would end in West's death . . . [which] would be the only way to insure [sic] that West did not report" Love and Smith's involvement given her familiarity with the two. Brief of Appellee at 19. And regardless, the State points to Love's subsequent acts to demonstrate she was a "willing participant" throughout the crime spree because she continued to participate even after Smith "manifested his intent to kill the victims." *Id.* at 20, 22.

The "intent to kill may be inferred from the deliberate use of a deadly weapon in a manner likely to cause death or serious injury. We have found sufficient evidence for conviction when the evidence indicates that a weapon was fired in the direction of the victim." *Bethel*, 730 N.E.2d at 1245 (citation omitted). A defendant is criminally liable for the use of a weapon by an accomplice even in the complete absence of evidence that the defendant was personally armed. *Wright*, 950 N.E.2d at 368.

Here, because Smith pointed the gun in West's direction when he fired it, he clearly had the specific intent to kill West. However, in determining whether Love aided Smith in the commission of West's attempted murder, the jury was

permitted to consider Love's presence at the crime scene, her companionship with Smith, failure to oppose the crime, and her conduct before, during, and after the shooting. *Id*. Love was present at the scene, is friends with Smith, or at the very least, was working with him in this scenario illustrating some companionship. There is no evidence she opposed the crime. However, Smith first fired a shot between West's feet as they exchanged their guns. As Smith pointed a gun at West's head and threatened to shoot her, West asked Love if she was going to let Smith rob her to which Love responded that it had nothing to do with her. She then checked West's pockets at Smith's direction, and Smith fired several shots at West as she fled.

[31] To determine Love's specific intent to kill West, the jury was permitted to look at subsequent events, which includes evidence pertaining to the murder of Staten and attempted murder of Standberry, as well as the Wallace Street shooting. These subsequent acts occurred after Smith manifested the intent to kill West by firing shots in her direction, and Love continued to participate in additional crimes throughout the night and early morning. Therefore, Love's conduct before, during, and after West's shooting, in conjunction with the other elements, suggests the two were working together and demonstrates sufficient evidence from which the jury could have concluded Love acted with the specific intent that West be killed and aided Smith by luring West to the scene.

## D. Antonio Turner, Antonio Trotter, and Mark May

[32] Next, Love challenges the sufficiency of the evidence supporting her attempted murder convictions related to Turner, Trotter, and May. Love does not

challenge the sufficiency of the evidence that she acted with requisite intent in the murder of Staten and attempted murder of Standberry during the crime spree, which occurred just hours before the Wallace Avenue shooting. The State argues that because Love was working with Smith during West's shooting and "plainly intended the deaths of Staten and Standberry under very similar circumstances a short time later," a jury could reasonably infer she that intended the crime spree to result in the Wallace Avenue victims' deaths. Br. of Appellee at 20. Love argues that the evidence supports a conclusion that she and Smith were the two people who showed up to the Wallace Avenue house, but "points to Smith as the sole shooter." Br. of Appellant at 25.

[33] In *Echols v. State*, our supreme court affirmed the defendant's attempted murder conviction under accomplice liability. 722 N.E.2d 805, 807 (Ind. 2000). The defendant, Carl Echols, drove his nephew, who was seated in the front passenger seat, and friend, seated in the backseat, to an apartment complex. As they approached the complex, the nephew told the friend to look for the street address while the defendant slowed down and turned the headlights off. The nephew then said, "There they go, Carl" and fired shots into a crowd using a shotgun that had been stowed between his seat and the door, and defendant fired the shotgun in the air. *Id*. at 806. The car sped away, ultimately crashed, and the three attempted to flee through the back-passenger side door but were surrounded by the police. The court acknowledged that presence or lack of opposition alone is insufficient to support accomplice liability; however, those factors are sufficient when in conjunction with a defendant's conduct before,

during, and after the crime, coupled with his or her companionship with the one who commits the crime. The court ultimately concluded a jury could have reasonably inferred from the defendant's conduct that he and his nephew planned to shoot at the crowd together or that defendant agreed to drive his nephew to the complex to fire the shots. A similar inference can be made here as well.

[34] Again, to determine whether a defendant aided another in the commission of the crime, the fact-finder considers: (1) presence at the crime scene; (2) companionship with another engaged in a crime; (3) failure to oppose the commission of the crime; and (4) the course of conduct before, during, and after the occurrence of the crime. *Wright*, 950 N.E.2d at 368. Here, Love was at May's house at the time of the shooting, had some level of companionship with Smith, and there is no evidence that she opposed the crime.

[35] In fact, although there are ample facts supporting Smith's role in the crime spree and few regarding Love, hours before the Wallace Avenue shooting she was involved in West's robbery, and does not dispute the evidence relating to the murder of Staten and attempted murder of Standberry. After the Wallace Avenue shooting, Love was subsequently found with Smith at Johnson's house. Although the bulk of the facts point to Smith as the primary actor, Love's course of conduct before, during and after the Wallace Avenue shooting suggests that the two were working together and Love continued to participate even after Smith first manifested the intent to kill by firing shots in West's direction. We therefore conclude there is "substantial evidence of probative

value" from which the jury could have concluded Love acted with the specific intent that May, Trotter, and Turner be killed. *Bailey*, 907 N.E.2d at 1005.

## II. Inappropriate Sentence

[36] Love asks this court to invoke our authority under Indiana Appellate Rule 7(B) to reduce her aggregate sentence to "no more than 65 years." Appellant's Br. at 29. Indiana Appellate Rule 7(B) provides this court the authority to "revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." A defendant bears the burden of persuading this court that his or her sentence is inappropriate under the standard. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006).

[37] Sentencing is a discretionary function of the trial court and is therefore entitled to considerable deference. *Cardwell v. State*, 895 N.E.2d 1219, 1222 (Ind. 2008). "Such deference should prevail unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character)." *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015).

[38] In reviewing a defendant's sentence, our principal role is to "attempt to leaven the outliers . . . not to achieve a perceived 'correct' result in each case." *Cardwell*, 895 N.E.2d at 1225. Moreover, we focus on the aggregate sentence rather than the number of counts, length of sentence on any individual count,

or consecutive versus concurrent nature of the sentence. *Id*. Ultimately, whether a sentence is inappropriate "turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Id*. at 1224.

[39] Love was charged with and convicted of murder, five counts of attempted murder as Level 1 felonies, and armed robbery, a Level 5 felony. The trial court stated that "based upon the nature of the crime spree, the extreme violence, the opportunity for each defendant to stop their behavior, and yet continue on with violence in the community," it found consecutive sentences appropriate. Tr., Vol. VII at 4. She received the following sentences totaling 130 years: Count I, 50 years for the murder of Staten; Count II, 30 years for the attempted murder of Standberry; Count III, 20 years for the attempted murder of West; Counts IV-VI, 30 years each for the attempted murders of Trotter, Turner, and May to be served concurrently with each other; Count VII, three years for the armed robbery of West to be served concurrently with Count III.

[40] The advisory sentence is the starting point our legislature has selected as an appropriate sentence for the crime committed. *Anglemyer v. State*, 868 N.E.2d 482, 494 (Ind. 2007), *clarified on reh'g*, 875 N.E.2d 218 (2007). The sentencing range for murder is forty-five to sixty-five years, with an advisory sentence of fifty-five years. Ind. Code § 35-50-2-3(a). The sentencing range for a Level 1 felony is between twenty and forty years, with an advisory sentence of thirty years. Ind. Code § 35-50-2-4(b). And the sentencing range for a Level 5 felony

is one to six years with an advisory sentence of three years. Ind. Code § 35-50-2-6(b).

[41] Love received a fifty-year sentence for the murder conviction, five years below the advisory sentence. She received twenty years for the attempted murder of West, ten years below the advisory sentence. The trial court sentenced Love to the advisory sentence of thirty years for the attempted murder of Standberry and the advisory sentence for the attempted murders of Turner, Trotter, and May, to be served concurrently. She also received the advisory sentence for the armed robbery of West to be served concurrently with the twenty-year sentence for the attempted murder of West.

[42] In conducting our review, we consider the aggravators and mitigators found by the trial court, but also any other factors appearing in the record. *Walters v. State*, 68 N.E.3d 1097, 1101 (Ind. Ct. App. 2017), *trans. denied*. At the sentencing hearing, the trial court identified Love's age and "traumatic upbringing" as mitigating circumstances. Tr., Vol. VI at 246. As to aggravating circumstances, the trial court identified the significant violence of the offenses and the fact that there were multiple victims, including one who is now paralyzed.

## A. Character of the Offender

[43] We conduct our review of a defendant's character by engaging in a broad consideration of his or her qualities. *Moyer v. State*, 83 N.E.3d 136, 143 (Ind. Ct. App. 2017), *trans. denied*. And a defendant's life and conduct are illustrative

of his or her character. *Washington v. State*, 940 N.E.2d 1220, 1222 (Ind. Ct. App. 2011), *trans. denied*. In examining a defendant's character, one relevant factor is his or her criminal history, the significance of which "varies based on the gravity, nature, and number of prior offenses in relation to the current offense." *Rutherford v. State*, 866 N.E.2d 867, 874 (Ind. Ct. App. 2007). In addition, although a record of arrests itself is not evidence of criminal history, it is appropriate to consider such a record as a poor reflection on the defendant's character as it may reveal that he or she has not been deterred despite contact with the criminal justice system. *Id.*

[44] As a juvenile, Love had a dismissed truancy allegation in 2012 and a true finding for possession of marijuana in 2016. As part of the possession sentence, Love was placed on juvenile probation. As an adult, Love was charged with battery by means of a deadly weapon, which was pending at the time of trial but ultimately dismissed.[7] *See* Appellant's App., Vol. III at 235. For the most part, the significance of Love's criminal history is low and the dismissed battery charge is the only charge remotely relevant to the current offenses. However, despite Love's previous contact with our criminal justice system, she was not

---

[7] In Love's Reply Brief, she argues that the State's reference to this charge is misplaced because the charge was "dismissed on the State's request and has no evidentiary value" as it was not reduced to a conviction, and "at the time of the instant offenses [she] had neither been arrested for, nor charged with, a crime from that incident." Reply Brief of Appellant at 6. She argues that the alleged victim in that incident, William McCoy, testified at trial that he observed Love fire a handgun near 10th and Rural Streets on July 5, two weeks before the instant offenses. At trial, the State offered that evidence to prove Love was the one who possessed the same .45 caliber handgun and the trial court admitted evidence for that limited purpose. In conducting our review, we may consider any factors appearing in the record. *Walters*, 68 N.E.3d at 1101.

deterred from committing these serious offenses. Nonetheless, at the sentencing hearing, the trial court acknowledged that Love's age was more of a mitigating circumstance because she lacked "significant juvenile history[.]" Tr., Vol. VI at 246.

[45] With respect to her age, Love asks this court to consider our supreme court's decision in *Brown v. State*, in which the court acknowledged the presumption that "juveniles are less culpable than adults and therefore are less deserving of the most severe punishments[,]" and stated that a court must consider an offender's youth in sentencing. 10 N.E.3d 1, 7 (Ind. 2014). However, the trial court already considered Love's young age as a "significant" mitigating circumstance when it imposed her sentence. Tr., Vol. VI at 249. Additionally, the presumption outlined in *Brown* applies to juveniles and is therefore inapplicable to Love as she was eighteen at the time of the offenses.

[46] As demonstrated by Dr. Henry's testimony, Love experienced juvenile trauma which has impacted her cognitive and emotional development. Love's mother was an alcoholic, her father was unavailable due to periods of incarceration, and she had an unpredictable relationship with her grandmother, with whom she lived. The trial court acknowledged Love's "traumatic upbringing" at sentencing and identified it as a mitigator. Tr., Vol. VI at 246.

## B. Nature of the Offense

[47] The nature of the offense is found in the details and circumstances of the commission of the offense and the defendant's participation in it. *Washington*,

940 N.E.2d at 1222. When determining the inappropriateness of a defendant's sentence that deviates from the advisory sentence, we consider whether there is anything more or less egregious about the offense as committed by the defendant that distinguishes it from the typical offense accounted for by our legislature when it set the advisory sentence. *Moyer*, 83 N.E.3d at 142.

[48] As to the nature of the offenses in this matter, the trial court judge described the incidents as "one of the worst crime sprees" he had seen in his thirty-nine years in the criminal justice system. Tr., Vol. VI at 248. Despite numerous opportunities to stop the crime spree or at least decline to take part further, Love nonetheless continued to willingly participate. As the trial court explained, "[i]t is difficult for anyone to comprehend how after one incident occurs and someone is murdered, how you go onto the next victim, and attempt to kill them, and then after that you go onto the next victim, and attack them. And all told, four separate instances that evening. Literally incomprehensible how that occurs and there is no moral conscience, nothing that stops you, nothing that says enough is enough." *Id*.

[49] As a result of Love's offenses, one person is deceased, four people survived but suffered serious injuries, and Standberry was left paralyzed with limited use of her upper extremities, and now lives in a nursing home despite being only 23 years of age. In her brief, Love acknowledges the trial court's characterization

of the nature of the offenses and significant injuries caused by her actions.[8]  *See*
Br. of Appellant at 27.  There is no question that the details and circumstances
surrounding Love's offenses are heinous, and the consequences thereof are
severe.  Although we recognize the hardships and trauma Love has
experienced, given the egregious nature of her crimes involving multiple victims
and her continued participation despite numerous opportunities to stop, we
cannot conclude Love's sentence is inappropriate in light of her character and
the nature of the offenses.

# Conclusion

For the foregoing reasons, we conclude the evidence is sufficient to support
Love's attempted murder convictions and her sentence is not inappropriate in
light of the nature of her offenses and her character.

Affirmed.

Baker, J., and Altice, J., concur.

---

[8] Notably, our jurisprudence on the issue of whether a defendant must demonstrate his or her sentence is inappropriate in light of *both* the nature of the offenses and his or her character is unsettled.  In *Sanders v. State*, a panel of this court held that "[b]ecause [the defendant] has failed to present any authority or analysis on the issue of the nature of his offenses, he has waived our review of the inappropriateness of his sentence." 71 N.E.3d 839, 844 (Ind. Ct. App. 2017), *trans. denied*.  However, the more common view is that Rule 7(B) requires us to *consider* both prongs in our assessment, but the defendant need not "necessarily *prove* each of those prongs render his sentence inappropriate." *Reis v. State*, 88 N.E.3d 1099, 1103 (Ind. Ct. App. 2017) (quoting *Connor v. State*, 58 N.E.3d 215, 219 (Ind. Ct. App. 2016)).