**Darmon D. BOND, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 71A03–0910–CR–457.**

Court of Appeals of Indiana.

April 21, 2010.

Rehearing Denied June 29, 2010.

Anthony V. Luber, South Bend, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Arturo Rodriguez, II, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

VAIDIK, Judge.

### Case Summary

Darmon D. Bond appeals his convictions for Class C felony altering an original identification number and Class D felony auto theft. We hold that (I) the absence of African–Americans from the jury venire did not violate Bond's Sixth Amendment jury trial rights, (II) the admission of expert fingerprint analysis did not violate Bond's Sixth Amendment confrontation rights, even though the verifying print examiner did not testify at trial, and (III) there is sufficient evidence to sustain Bond's convictions. We affirm.

### Facts and Procedural History[1]

Richard Lesiuk lived in South Bend and owned a 1992 blue Plymouth Acclaim. On January 11, 2008, Lesiuk brought his car to mechanic Louis Bueno to have a new muffler installed. Bueno took the car to Rainbow Mufflers. At some point Lesiuk was informed that his car was missing from Rainbow. He reported the vehicle stolen to South Bend Police on January 14.

Two days later Officer Anthony Ieraci spotted Lesiuk's Plymouth parked outside Bond's residence. The license plate was missing, and a temporary paper tag had been placed in the rear window. Officer Ieraci checked the Vehicle Identification Number (VIN) displayed on the dashboard. The VIN did not match the car. Officer Ieraci impounded the vehicle.

Law enforcement inspected the Plymouth and found that a false VIN plate had been duct-taped underneath the dashboard panel. Police verified that both the VIN plate and the temporary paper tag had been taken from other cars.

Forensic lab technician Jillian Frick processed Lesiuk's vehicle for fingerprints. She found two prints on the duct tape used to fasten the VIN plate to the dashboard.

---

1. We heard oral arguments in this case on March 29, 2010, at Valparaiso University School of Law. We thank the students of Valparaiso for their hospitality and involvement. We also commend the parties for the quality of their advocacy. Oral arguments are an important facet of the appellate process and a valuable educational experience. We treasure the opportunity to hold arguments in an academic setting before a crowd of young legal scholars.

She also lifted a print from the temporary paper tag. Frick turned her findings over to examiner Lacie Klosinski. Klosinski conducted fingerprint comparisons. She identified a print on the duct tape as Bond's right thumbprint and the print on the temporary license plate as Bond's left thumbprint.

The State charged Bond with Class C felony altering an original identification number and Class D felony auto theft. He was tried in St. Joseph Superior Court.

At trial, the jury pool contained no African–Americans. Bond moved to strike the entire venire because it did not represent a fair cross-section of the community. The trial court denied the motion. The trial court explained that the jury panel selection process was entirely random:

> The procedure utilized by the Court is in accordance with the jury rules. We use a one tier system, pursuant to local rule. The names that are provided to the Court, are provided by the Indiana Judicial Center, State Court Administration, based upon the list that is provided by them. The list is then inserted into the computer, then names are randomly drawn from that list.

> Every time a judge asks for a jury pool, there is no weighting of numbers of jurors who are selected from a particular area or zip code within St. Joseph County. It's done completely randomly.

> That's just my Record as to how jurors are selected.

> As a matter of fact, the jurors are even seated in the jury box and numbered randomly without any input by the Court.

> And so the motion to strike the entire panel is denied.

Tr. p. 75.

The State called both Frick and Klosinski to testify to the results of their finger-print analyses. Klosinski explained that fingerprint examiners use a methodology called "ACE–V," which stands for "Analyze," "Compare," "Evaluate," and "Verify":

> During the "analyze" phase, we look at the overall print as a whole, the ridge flow of the print, and decide whether that print is actually going to be of value for comparison.

> During the "comparison" phase, we actually would look at three levels of detail in the print; level one, being the actual pattern, which would be an arch, loop or a whirl; level two, would be ... the ridge endings or bifurcations and their relative positions to each other or their arrangement within the friction ridge skin; and level three, is ridgeology, which is actually the shape of each individual ridge.

> During the "evaluation" phase, we would make our determination of whether or not the fingerprint would be an individualization or a match.

> And then during the "verification" phase, if the print was identified to be a suspect or person, that whole process would be ... the whole ACEV process would be repeated again by a second qualified examiner.

*Id.* at 196–97. Klosinski testified that she used the ACE–V methodology in this case. She detailed the course of her analysis and testified that Bond's fingerprints matched those found on the duct tape and paper license plate.

The State rested after Klosinski testified. Bond then moved to strike Klosinski's testimony because the examiner responsible for the "verification" phase did not appear and testify. The trial court denied the motion. The court acknowledged that forensic labs follow verification procedures, but it did not consider inde-

pendent verification a condition for the admissibility of Klosinski's testimony.

The jury found Bond guilty as charged. He now appeals.

### Discussion and Decision

Bond raises three issues which we reorder and restate as follows: (I) whether the absence of African–Americans from the jury pool violated his Sixth Amendment jury trial rights, (II) whether the admission of the fingerprint test results violated his Sixth Amendment confrontation rights, and (III) whether there is sufficient evidence to sustain his convictions.

### I. Absence of African–American Members from the Jury Pool

■ Bond first argues that the absence of African–Americans from the jury venire violated his rights to an impartial jury.

■ The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury." The United States Supreme Court has long held that "the selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial." *Taylor v. Louisiana*, 419 U.S. 522, 528, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). To show a prima facie violation of the fair-cross-section requirement, the defendant must show that: (1) the group being excluded is a distinctive group in the community; (2) the representation of this group in jury pools from which juries are being selected is not fair and reasonable in relation to the number of such persons in the community; and (3) this underrepresentation is caused by systematic exclusion. *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979); *Berghuis v. Smith*, —— U.S. ——, ——, 130 S.Ct. 1382, 1384, 176

L.Ed.2d 249 (2010); *Ewing v. State*, 719 N.E.2d 1221, 1226 (Ind.1999).

Here Bond offers no evidence that an underrepresentation of African–Americans in the jury venire was caused by systematic exclusion. Accordingly, he concedes that his claim cannot prevail under *Duren*. Appellant's Br. p. 18; *see also Wilder v. State*, 813 N.E.2d 788, 793 (Ind.Ct.App. 2004) (holding that although African–Americans may have been underrepresented in the jury pool, the defendant's claim failed because he did not provide evidence that the selection process systematically excluded African–Americans), *trans. denied*.

Bond nonetheless asks us to "alter the criteria for determining whether the jury selection procedure is actually producing juries that are representative cross-sections of the community. The criterion should be that when no member of an acknowledged distinctive group is present in a jury venire that the venire be excused and another summonsed." Appellant's Br. p. 19. "This remedy would not be available if there was a showing, using valid and recognized statistical and sampling methods, that the groupings from which jury pools are selected do include these distinctive groups, particularly racial and ethnic minorities, in numbers reasonably proportional to their presence in the community." *Id.* at 19–20.

We are bound by *Duren* and *Ewing* and are not at liberty to adopt Bond's proposed standard. We are sensitive to Bond's concerns, however, for two main reasons. First, Indiana jury selection procedures have changed in recent years. The lists compiled for jury selection used to be generated at the local county level but are now created by the state Judicial Center. This migration as a practical matter makes the collection of jury-selection information more difficult for defendants who are at-

tempting to establish their fair-cross-section prima facie cases.

Second, in other race or gender-based Constitutional jury challenges, the burden shifts more easily to the State to establish the legitimacy and neutrality of its procedures. *See Batson v. Kentucky*, 476 U.S. 79, 96–97, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). In *Batson*, the United States Supreme Court set forth a three-step process for challenging the State's allegedly discriminatory exercise of peremptory strikes. *Jeter v. State*, 888 N.E.2d 1257, 1263 (Ind.2008), *cert. denied*, —— U.S. ——, 129 S.Ct. 645, 172 L.Ed.2d 626 (2008). The party raising the *Batson* challenge must first make a prima facie showing that the other party exercised a peremptory challenge on the basis of race. *Id.* (citing *Batson*, 476 U.S. at 96, 106 S.Ct. 1712). The burden then shifts to the party exercising the peremptory strike to present a race-neutral explanation for striking the juror. *Id.* (citing *Batson*, 476 U.S. at 97, 106 S.Ct. 1712). Finally, the trial court must decide whether the party making the *Batson* challenge has carried its burden of proving purposeful discrimination. *Jeter*, 888 N.E.2d at 1263 (citing *Batson*, 476 U.S. at 98, 106 S.Ct. 1712). *Batson* sought to relieve defendants of the "crippling burden of proof" which existed under earlier precedent, *see Swain v. Alabama*, 380 U.S. 202, 223–24, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), and which formerly required a defendant to show systematic discrimination by the State extending beyond his own case. *Batson*, 476 U.S. at 92–93, 106 S.Ct. 1712.

To be sure, "no court has found the burden shifting principle from *Batson* to be appropriate in the *Duren* context." *United States v. Neighbors*, 590 F.3d 485, 492 (7th Cir.2009). But the federal constitution "establishes rights that the states may choose to expand." *Edwards v. State*, 902 N.E.2d 821, 829 (Ind.2009). Given the practical difficulties of showing systematic exclusion of minorities from jury pools in Indiana, we think easing the *Duren* burden for Hoosiers may be worth considering.

For now it is a good first step to have selection procedures on the internet. Those procedures may be found at http://www.in.gov/judiciary/center/jury/. It is important for judges and litigants to be apprised of the Judicial Center's selection processes.

In any event, Bond has failed to show that the jury selection process systematically excludes African–Americans. We therefore conclude that under the current state of the law in this area, the absence of African–Americans from the jury venire did not violate Bond's Sixth Amendment right to an impartial jury.

## II. Admission of Fingerprint Test Results

Bond next argues that the trial court erred by admitting Klosinski's testimony conveying the results of her fingerprint analysis. Bond's contention is "not that Klosinski was not qualified or that the ACE–V method did not meet the *Daubert* [*v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)] standards. The challenge is that the method was not followed AND that Bond was denied the opportunity to confront an essential witness to the ACE–V process." Appellant's Br. p. 9.

■ "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Ind. Evidence Rule 702(a). "Expert scientific testimony is admissible only

if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable." Evid. R. 702(b). The reliability of expert scientific evidence may be established by judicial notice or a sufficient foundation to persuade the trial court that the relevant scientific principles are reliable. *Malinski v. State,* 794 N.E.2d 1071, 1084 (Ind.2003). "Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the Court...." Evid. R. 104(a). "In making its determination, the Court is not bound by the Rules of Evidence, except those with respect to privileges." *Id.*

 Indiana courts assess the reliability of expert scientific evidence by considering the factors set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). As our Supreme Court has explained,

> The United States Supreme Court's *Daubert* decision, coincidentally handed down just weeks after Indiana's Rule 702(b) was adopted, interpreted Federal Rule of Evidence 702 as requiring that expert testimony "be supported by appropriate validation—i.e., 'good grounds,' based on what is known," and as "establish[ing] a standard of evidentiary reliability." The concerns driving *Daubert* coincide with the express requirement of Indiana Rule of Evidence 702(b) that the trial court be satisfied of the reliability of the scientific principles involved. Thus, although not binding upon the determination of state evidentiary law issues, the federal evidence law of *Daubert* and its progeny is helpful to the bench and bar in applying Indiana Rule of Evidence 702(b).

*Steward v. State,* 652 N.E.2d 490, 498 (Ind. 1995) (citation omitted). The *Daubert* factors include whether the scientific theory or technique (1) can be and has been tested; (2) has been subjected to peer review and publication; (3) has a known or potential error rate; (4) is governed by maintained standards controlling its operation; and (5) has gained widespread acceptance in a relevant scientific community. 509 U.S. at 593–94, 113 S.Ct. 2786; *see also Burnett v. State,* 815 N.E.2d 201, 206 (Ind. Ct.App.2004) (noting this list of factors is "non-exclusive"). Although all of these factors and others may be relevant, none is by itself dispositive, and not all need be present for a trial court to find the proffered evidence rests upon reliable principles. *See McGrew v. State,* 682 N.E.2d 1289, 1292 (Ind.1997) (no single "test" determines reliability under Rule 702(b)). However, the proponent of the expert scientific testimony bears the burden of persuading the trial court it is more likely than not that the scientific principles upon which the testimony rests are reliable. *Burnett,* 815 N.E.2d at 206.

In *Burnett,* this Court recognized that "the ACE–V methodology is generally accepted by the [International Association for Identification], an international organization in the field," and that "fingerprint experts in several states, including Indiana, Ohio, Illinois, and Michigan, use the ACE–V method for fingerprint identification." *Id.* at 209. We found that the "ACE–V methodology is generally accepted within [fingerprint examiners'] relevant field of study and that it is more likely than not that the scientific principles upon which [print examiners'] testimony rests are reliable." *Id.*

 Meanwhile the Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." The Confrontation Clause bars admission

of testimonial hearsay unless the declarant is unavailable to testify and the defendant has had a prior opportunity to cross-examine him. *Crawford v. Washington,* 541 U.S. 36, 53–54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). The Sixth Amendment confrontation right applies only to "testimonial" statements. *Davis v. Washington,* 547 U.S. 813, 821, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). Testimonial statements may include

> *ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; extrajudicial statements … contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

*Crawford,* 541 U.S. at 51–52, 124 S.Ct. 1354 (citations omitted).

■ Lab analysts who prepare reports for use in criminal prosecutions are witnesses for purposes of the Sixth Amendment confrontation right, their reports are affidavits that fall within the "core class" of testimonial statements covered by the Confrontation Clause, and a defendant's Sixth Amendment right is violated when the defendant is not allowed to confront them at trial. *Melendez–Diaz v. Massachusetts,* —— U.S. ——, 129 S.Ct. 2527, 2531, 174 L.Ed.2d 314 (2009). In *Melendez–Diaz,* law enforcement seized from the defendant a white substance resembling cocaine. *Id.* at 2530. The State introduced three "certificates of analysis" at trial prepared by forensic scientists who analyzed the seized substance. *Id.* at 2531. The certificates reported the composition, quality, and net weight of the narcotic. *Id.* The analysts were not called to testify at trial. *See id.* The Supreme Court held that the admission of the lab certificates violated the defendant's Sixth Amendment rights. *Id.* at 2532. The Court concluded that "the analysts' affidavits were testimonial statements, and the analysts were 'witnesses' for purposes of the Sixth Amendment. Absent a showing that the analysts were unavailable to testify at trial and that petitioner had a prior opportunity to cross-examine them, petitioner was entitled to " 'be confronted with' " the analysts at trial." *Id.* (quoting *Crawford,* 541 U.S. at 54, 124 S.Ct. 1354). However, the Court clarified that "we do not hold, and it is not the case, that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case." *Id.* at 2532 n. 1. The Court's ruling "does not mean that everyone who laid hands on the evidence must be called." *Id.; see also Pendergrass v. State,* 913 N.E.2d 703, 708 (Ind.2009) (finding Sixth Amendment not violated where lab supervisor testified to inculpatory DNA test results, but analyst who performed tests did not appear at trial), *cert. pending.*

We first note that Bond did not raise a timely objection to Klosinski's expert testimony and her ultimate conclusions. Defense counsel asked to strike Klosinski's testimony only after the witness stepped down and the State rested its case-in-chief. In this respect we find Bond's objections were likely waived. But given our preference for resolving cases on their merits, we will address his arguments on appeal.

■ To the extent Bond argues that the ACE–V method "was not followed,"

the record shows otherwise. Klosinski explained the steps involved in the ACE–V methodology and testified that she used ACE–V in this case. Whether the ACE–V method was observed was a preliminary question for the trial court under Rule 104(a), and the court was not bound by the rules of evidence in making its determination. In light of Klosinski's testimony—along with the established reliability of the ACE–V protocol and Klosinski's qualifications as an expert witness—we cannot say the trial court erred by finding that the ACE–V method was applied and that Klosinski's opinion was admissible under Rule 702.

■■■ The thrust of Bond's argument is that the State's failure to produce the verifying print examiner violated his Sixth Amendment confrontation rights. However, Bond points to no testimonial out-of-court statements which were offered against him and which form the basis of his Sixth Amendment challenge. The State called both forensic technician Frick and latent print examiner Klosinski. Frick testified to the processes she used to develop the prints found on the duct tape and temporary license plate. Klosinski testified to the results of her own fingerprint comparisons. To be sure, Klosinski said that the ACE–V protocol was followed, which means one other examiner analyzed the latent prints. That examiner did not appear in court. But the verifier's results were not introduced at trial, and neither Frick nor Klosinski testified to his results or conclusions. *Cf. State v. Connor*, 156 N.H. 544, 937 A.2d 928, 930 (2007) (finding error where initial examiner "did not merely testify that all four steps of [the ACE–V] procedure had been followed. Instead, he described the verification process, and the results of the verification conducted...."). In short, the absent examiner's results were never referenced,

and we are accordingly left with no predicate for a Sixth Amendment confrontation violation.

For the foregoing reasons, we cannot say that Bond was denied his confrontation rights when the trial court admitted Klosinski's expert testimony and conclusions.

## III. Sufficiency of the Evidence

Bond finally argues that there is insufficient evidence to sustain his convictions for altering an original identification number and auto theft.

Our standard of review with regard to sufficiency claims is well settled. In reviewing a sufficiency of the evidence claim, this Court does not reweigh the evidence or judge the credibility of the witnesses. *Lainhart v. State*, 916 N.E.2d 924, 939 (Ind.Ct.App.2009). We will consider only the evidence most favorable to the verdict and the reasonable inferences drawn therefrom and will affirm if the evidence and those inferences constitute substantial evidence of probative value to support the verdict. *Id.* A conviction may be based upon circumstantial evidence alone. *Id.* Reversal is appropriate only when reasonable persons would not be able to form inferences as to each material element of the offense. *Id.*

### A. Altering an Original Identification Number

■■■ "A person who knowingly: (1) damages; (2) removes; (3) covers; or (4) alters; an original or a special identification number commits a Class C felony." Ind.Code § 9–18–8–12. Here the charging information alleged that Bond "knowingly altered an original vehicle indentification [sic] number on a Plymouth Acclaim belonging to Richard Lesuik [sic]." Appellant's App. p. 3.

Our Supreme Court has observed that "fingerprint evidence ... has repeatedly been shown to be undeniably accurate in

the identification of individuals," *Cornett v. State*, 450 N.E.2d 498, 500 (Ind.1983), and that it is "universally recognized" that a fingerprint found in place where a crime was committed may be sufficient proof of identity. *Shuemak v. State*, 254 Ind. 117, 119, 258 N.E.2d 158, 159 (1970).

The evidence most favorable to the verdict reveals that a VIN plate was taken from another vehicle and taped inside the dashboard panel of Lesiuk's blue Plymouth. Forensics experts discovered a latent thumbprint on the duct tape used to fasten the VIN plate to the dashboard. The print belonged to Bond. This evidence is sufficient to sustain a finding that (1) the special identification number on Lesiuk's car was altered and (2) Bond was the one who altered it. We conclude there is sufficient evidence to sustain Bond's conviction for altering an original identification number.

### B. Auto Theft

"A person who knowingly or intentionally exerts unauthorized control over the motor vehicle of another person, with intent to deprive the owner of: (1) the vehicle's value or use; or (2) a component part ... of the vehicle; commits auto theft, a Class D felony." Ind.Code § 35–43–4–2.5(b). The charging information alleged that Bond "did knowingly exert unauthorized control over the motor vehicle of Richard Lesuik [sic], to-wit: Plymouth Acclaim belonging to Richard Lesuik [sic], by with [sic] the intent to deprive Richard Lesuik [sic] of any part of the vehicle's value or use." Appellant's App. p. 3.

The mere unexplained possession of recently stolen property standing alone does not automatically support a conviction for theft. *Fortson v. State*, 919 N.E.2d 1136, 1143 (Ind.2010). Rather, such possession is to be considered along with the other evidence in a case, such as how recent or distant in time the possession was from the moment the item was stolen and the circumstances of the possession (say, possessing right next door as opposed to many miles away). *Id.* In essence, the fact of possession and all the surrounding evidence about the possession must be assessed to determine whether any rational juror could find the defendant guilty beyond a reasonable doubt. *Id.*

Lesiuk's car went missing sometime between January 11 and January 14. Police discovered Lesiuk's car parked outside Bond's house on January 16. Law enforcement identified Bond's thumbprints inside the vehicle, both on the duct tape that secured the false VIN plate to the dashboard and on the temporary paper license placed in the rear window. We find that (1) the discovery of the car at Bond's house, (2) the proximity in time between the theft and the vehicle recovery, and (3) Bond's prints on the falsified VIN and license plate together sustain an inference that Bond exerted unauthorized control over Lesiuk's car with the intent to deprive Lesiuk of the value and use thereof. We conclude that there is sufficient evidence to sustain Bond's auto theft conviction.

Affirmed.

BARNES, J., and CRONE, J., concur.