## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 30 2019, 8:14 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Valerie K. Boots
Marion County Public Defender Agency
– Appellate Division

Loren J. Comstock
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Chandra Hein
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

John Beeler,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

April 30, 2019

Court of Appeals Case No.
18A-CR-1634

Appeal from the Marion Superior Court

The Honorable Jeffrey L. Marchal, Magistrate

Trial Court Cause No.
49G06-1612-F1-48357

**Mathias, Judge.**

[1] John Beeler ("Beeler") appeals his conviction and sentence for child molesting as a Level 1 felony after a bench trial in Marion Superior Court. He argues that

the evidence was insufficient to support the conviction and that his thirty-year sentence was an abuse of discretion. We affirm.

## Facts and Procedural History

H.W., who was eight at the time of the events in this case, attended the day care at Charity Church Ministry ("Charity"). She attended the before and after school care program and took the bus to Christel House Academy West ("Christel House"). Beeler was H.W's caregiver at Charity before she took the bus to school. His role was to watch the children then escort them to the bus to get to their school. Beeler also drove a bus, but not the bus that H.W. rode.

On December 5, 2016, when H.W got off the bus at Christel House, she approached her teacher, Kelly Lenkay ("Lenkay") and asked to speak with her. Lenkay observed that H.W. seemed "[v]ery nervous" and "just kind of flat in her tone." Tr. Vol. II, p. 23. H.W. had an emoji toy with her. Lenkay told H.W. to wait in the hallway while she secured the other kids then spoke privately with H.W.  H.W. told her teacher, "I was at the daycare when it happened, and I saw something long and brown, and I had a yellow blindfold on, and [Beeler] had stuck something in my mouth." Tr. Vol. II, p. 59. Lenkay thanked H.W. for telling her what had happened and told her that she intended to report it immediately.

H.W. testified at the bench trial regarding what happened while she was at before school care:

> [Beeler] would take all the kids from the first classroom and bring them to the sanctuary, which is the after schoolers' classroom. Then, um, he would take, he would leave everybody else in one of the cubicle classrooms and he would take me to the snack room, and he would get, um, he would get one of the snacks that we had and, um, he would get a blindfold, and he would put the snack in my mouth. It was liquid. And he would put it in my mouth and make sure there is a blindfold on me and he would ask can you see anything, and I said no. I mean, I said, yes, and he would tighten it to make sure that I couldn't see anything. And he would tell me to bend over, and this is by the snack room. And he said, um, do not use your teeth, and um, he had dipped something in there the first time with a dark, he had put a dark blue bandanna [sic] over my eyes and he would dip something in the snack, and um, he would put it in my mouth.

Tr. Vol. II, pp. 43–44. He also told her to "'put it in your mouth as far as you can.'" *Id.* at 47. H.W. felt something "round" in her mouth and that it was "warm." *Id.* at 47, 48. On one occasion, she moved away because "it filled up my whole mouth." *Id.* at 48. When she asked Beeler what he was putting in her mouth, he told her it was one of the soft foam blocks, or one of the emoji rings that he gave her. The emoji ring is "a ring that's yellow and has an Emoji face on it, and, um, it can glow." *Id.* at 49. She testified that she put both of these objects in her mouth and they did not feel like what Beeler put in her mouth. At the time he placed the object in her mouth, she was not sure what it was. However, at trial, she was sure it was his penis.

[5]     The snacks she remembered Beeler using were applesauce and yogurt. Beeler would first take her into the snack room then would take her into another room. This second room was used for storage, and no one ever played in there. Every

time she played this game with Beeler, it occurred in the same room, and the lights were off every time. The blinds in the room were shut.

[6] H.W. also testified that Beeler normally used dark blue blindfolds, but on the last occasion on December 5, 2016, he used a yellow blindfold. When he used this yellow blindfold, Beeler asked H.W. if she could see. H.W. told Beeler she could not see; however, she could actually see through the yellow blindfold. *Id.* at 54. On this occasion, she was able to see that Beeler was placing "something brown, um, long, round on the sides" in her mouth. *Id.* She testified that she did not know what it was at the time, and that then she thought it was brown, long and "[i]t was where his crotch was, and it was the same color as his skin, and it was, um, it was very close to his body." *Id.* at 57. When this game was over, she and Beeler joined the remainder of the children in his care and Beeler escorted them to the bus.

[7] After speaking with H.W., Lenkay called the school's counselor, Emily Yang ("Yang"). Yang then took H.W. with her to the counseling office. Yang testified that as she approached Lenkay and H.W., H.W. appeared upset, in shock, and like she did not want to be around other people. Since H.W. appeared visibly upset, Yang took H.W. to her office. The two talked, and H.W. told her that

> [Beeler] had taken her into a closet at Charity just with the two of them where they had played a game that she had to guess the snack of the day. And she said she had played the game with him before and he would always use a blindfold. On the previous occasions, he had used a dark blue blindfold, and on this

occasion, it had been a yellow blindfold, so she was able to see through it. She demonstrated for me. She stood up and leaned over, and said that's what she had to do as part of the game, and she was supposed to taste what the snack was for the day. Um. She said it was either yogurt or applesauce or ranch on the different occasions that they had done this, and she said some of the rules of the game were you had to taste at the back of your mouth and you also had to not use your teeth. Um. She said- oh, excuse me, let me add. Um. She said because it had been a yellow blindfold that day, she had been able to see through it, and she told me she believed it was his private part. Uh. At that time, I asked her, because we do body safety at school so students learn vocabulary for body parts, I asked her, "what do you mean by private part," and she said his penis.

*Id.* at 135. Yang walked H.W. back to class and made a report to the Department of Child Services. She also alerted her principal because of the nature of the report and because the school had a close working relationship with Charity. Yang testified that she was eventually able to make contact with H.W.'s mother, Yolanda Wilburn ("Wilburn"), who worked as a teacher at Charity. Wilburn came to the school and spoke with her and H.W. about the incident.

[8]   Wilburn testified that H.W. is an only child and has attended Charity since infancy. Wilburn took H.W. to work with her around 5:45 a.m. and then, sometime before 7:00 a.m., H.W. entered the before care program, where, for a time, Beeler was her teacher until she got on the bus to go to Christel House. When H.W. went into the before care program with Beeler, Wilburn would work in the receiving room, in a different section of the building.

[9] On that day, Wilburn was notified by her boss that Christel House was trying to get in touch with her. Wilburn immediately drove to Christel House. At Christel House, she met with Yang, who explained what had happened. Wilburn then spoke with H.W., who told her what had happened. H.W. told Wilburn she wanted to stay at school because it made her feel better and she wanted to finish her classwork. Wilburn then went to return to work; however, she sat in her van because she did not feel capable of driving. Her boss, Juaneka Ennis, came to take her back to Charity. Kevin Essettt ("Essettt"), the Human Resources director for Charity, drove Wilburn's van for her.

[10] Wilburn remembers "[H.W.] asking me about did she have to go to after school care, or did she have to go with the teachers" a little bit before these events. Tr. Vol. II, p. 92. These questions were not typical of H.W.; she had not asked these sorts of questions since she was much younger, about two or three years old. Wilburn knew Beeler for about as long as she had worked at Charity. She also knows his wife, children, and grandchildren. Prior to these events, she had a good working relationship with him. She also testified that about a week or so before the events at issue, Beeler approached her "and asked me if he could take [H.W.] out, um, maybe take her to a game or something, and offered to, you know, wanted to know if it would be okay if she could like spend the night over to the house or something like that, with him and his grandkids." *Id.* at 78. Although his requests did not seem odd to her at the time, Wilburn did not allow this because she does not generally let H.W. spend nights at anybody's house.

Before that day, H.W. was one of Lenkay's best students, "always very happy, willing to help, very smiley." *Id.* at 28. On December 5, 2016, H.W. was flat and nervous all day. After December 5, 2016, H.W. would have numerous breakdowns, become very nervous or self-conscious, or refuse to speak with Lenkay or Yang. *Id.* at 30. While Lenkay no longer teaches H.W., she still sees her every day and has observed that H.W. still seems nervous. Yang testified that she did not believe that H.W. has returned to the demeanor she had before December 5, 2016. In the months afterward, H.W. would come to her frequently asking for a break from class because she would be overwhelmed with anxiety, mostly related to dreams she had been having related to the incident. She has also observed that H.W. has intense reactions when other kids bumped into her or if someone broke a physical boundary with her, even if the kid did not do that on purpose. Wilburn stated that she has noticed changes to H.W.'s sleep. H.W. now has nightmares, needs Melatonin to help her rest, wants to sleep with Wilburn more, and "she stays closer to me even more than she did before." *Id.* at 90–91. H.W. has continued to do well academically but has been emotional.

Ennis, the Executive Director of Charity, has known H.W. since H.W. began attending Charity as an infant. Since December 5, 2016, Ennis has observed that H.W. will never eat the applesauce, ranch, or yogurt when it is on the snack menu. H.W. has also become more withdrawn compared to the child Ennis knew before December 5, 2016. Ennis testified that there was no reason for any of the school-age children to be in the room in which these events

occurred. School-age children would be in the nearby snack room, but only during snack time, which was from 3:00 p.m. to 4:30 p.m. She also confirmed that H.W.'s mother worked in a completely separate building. The doors have since been removed from the storage room, and a table has been placed in front of the blinds preventing them from being closed. The school had cameras at the time, but not in this area. Additional cameras have since been installed.

[13] Kevin Essett, the Human Resources manager at Charity, testified that his responsibilities included "staff interaction, discipline, hiring, firing, different things of that nature." *Id.* at 159. On December 5, 2016, after assisting Wilburn back to Charity from Christel House, Essett, Ennis, and Charley Thomas, another member of the administration, met with Beeler. Essett asked Beeler about the allegations. Essett testified that, on that day, Beeler affirmed that he would have H.W. go into a closet or dark room, place a dark blue blindfold on her, and she would have to bend over to put something in her mouth, usually applesauce, yogurt, or ranch. Beeler also confirmed that he would give her an emoji ring at the end of the surprise and that she would have to taste it at the back of her throat. Beeler denied placing his penis in her mouth.

[14] About a week later, Essett also had a second meeting with Beeler, where Beeler informed him that he and H.W. were playing "Fear Factor." Essett then became confrontational with Beeler and said, "Dude, it took you a week to come up with this?" and "probably used some expletives." *Id.* at 167. In this second meeting, Essett denied threatening Beeler. Beeler never provided Essett with an explanation of what he placed in H.W.'s mouth.

[15] Laura Fuhrman, a Forensic Child Interviewer with the Marion County Child Advocacy Center, testified. She is trained in forensic interviewing of children. She interviewed H.W. on December 6, 2016. Before the interview, all she knew was that the allegations were of sexual abuse and the alleged perpetrator was known as "Brother John." *Id.* at 150. She begins interviews "blind so that everything I get is from the child themselves and not from any, anyone else that might have heard something or know something." *Id.* at 149–150. H.W. disclosed to her "sexual abuse by Brother John." *Id.* at 151. The reported sexual abuse had occurred the previous day, and there had been other incidents.

[16] Detective McCurdy, the detective with the Indianapolis Metropolitan Police Department ("IMPD") who was assigned to the matter, testified regarding his interview with Beeler. Detective McCurdy went through Beeler's rights with him, and Beeler signed a waiver. Beeler, after waiving his rights, told Detective McCurdy that he placed a blindfold on H.W. and that "he would put different snacks and various objects such as applesauce, yogurt, or ranch. He would put something in a bowl and she would bend over and get the object out of a bowl." *Id.* at 187. Beeler told the detective they played this game two or three times but varied on what color blindfolds were used. Beeler told the detective that he was placing the emoji rings in H.W.'s mouth. Beeler initially told the detective that he played this game with H.W. in a large open room and then changed it to the storage closet next to the snack room. Beeler also told the detective that he was wearing a belt that day that was hanging down and that H.W. may have confused his belt for the object placed in her mouth.

[17] After being advised of his right to remain silent, Beeler testified in his own defense at the bench trial. He testified that he was a before and after school care teacher. He was to take care of the school-age children, and that entailed getting the kids on the bus as well as driving one of the buses. He took care of H.W. in the morning, but she was assigned to a different teacher in the afternoon. He testified he played games and activities with the children at Charity, and those games entailed putting objects into their mouths with ranch or applesauce or other items. He testified that it was H.W.'s idea to add the blindfold to the game and that he probably played this game with her three times. Beeler testified that on December 5, 2016, he picked up the emoji ring, placed it in the ranch, and H.W. bent over to get the emoji ring out of a bowl. He never told her to bend down, and she retrieved the emoji ring out of a bowl of applesauce with her mouth. He testified that sometimes she got marshmallows out of applesauce or yogurt in the bowl. He testified there was also probably some candy, but he did not use carrot sticks or crackers. He testified that he never told H.W. not to use her teeth and he never used foam blocks in the game.

[18] Beeler agreed that the lights were off in the room when they played this game, but that it was light enough to see her face and her body and that she was blindfolded. He agreed that the belt he was wearing that day was flat and cylindrical and did not look like a male private part. He also testified that he never placed his penis in H.W.'s mouth and that he never exposed himself to H.W. He thinks H.W. is a "good kid," and before all of this, he never had any problems with her and believed she liked him. After being arrested and booked

into the Marion County Jail, Beeler called his wife and, in a brief phone call, told her, "I made bad decisions." Ex. Vol., State's Ex. 25; Tr. Vol. II, pp. 242–243.

[19] Beeler was initially charged with three counts of Child Molesting as a Level 1 felony. After Beeler waived his right to jury trial, the State dismissed Counts II and III, and a bench trial was held on Count I. At the conclusion of the bench trial, the trial court found Beeler guilty. The trial court later sentenced him to thirty years in the Department of Correction ("DOC"). Beeler now appeals.

# Discussion and Decision

### I. Sufficiency of Evidence

[20] When reviewing challenges to the sufficiency of the evidence, we do not reweigh the evidence or judge the credibility of the witnesses. *Bond v. State*, 925 N.E.2d 773, 781 (Ind. Ct. App. 2010), *trans. denied*. Instead, we consider only the evidence most favorable to the verdict and the reasonable inferences drawn therefrom, and we will affirm if the evidence and those inferences constitute substantial evidence of probative value to support the verdict. *Id.* Reversal is appropriate only when a reasonable trier or fact would not be able to form inferences as to each material element of the offense. *Id.*

[21] In support of his argument that the evidence was insufficient to sustain a conviction, Beeler largely relies on his challenge to H.W.'s testimony as incredibly dubious. The incredible dubiosity standard is a difficult standard to meet and requires great ambiguity and inconsistency in the evidence. *Moore v.*

*State*, 27 N.E.3d 749, 756 (Ind. 2015). It applies only in limited circumstances. *Id*. at 754. "For the incredible dubiosity rule to apply, the evidence presented must be so unbelievable, incredible, or improbable that no reasonable person could ever reach a guilty verdict based upon that evidence alone." *Id.* at 751.

> If a sole witness presents inherently improbable testimony and there is a complete lack of circumstantial evidence, a defendant's conviction may be reversed. This is appropriate only where the court has confronted inherently improbable testimony or coerced, equivocal, wholly uncorroborated testimony of incredible dubiosity. Application of this rule is rare and the standard to be applied is whether the testimony is so incredibly dubious or inherently improbable that no reasonable person could believe it.

*Fajardo v. State*, 859 N.E.2d 1201, 1208 (Ind. 2007) (quoting *Love v. State*, 761 N.E.2d 806, 810 (Ind. 2002)).

[22]  Here, we do not see great ambiguity, nor do we see inconsistency in the evidence. H.W.'s testimony is unequivocal and, while appalling, is not inherently improbable. We see corroboration with H.W. having told her school counselor the same story. Multiple adults testified that they have observed personality and emotional changes in H.W. since December 5, 2016. Beeler himself admitted that the vast majority of H.W.'s testimony is true: that they played a game in a storage room near the snack room, that he used blindfolds, that the lights were off and the blinds were shut, that he used applesauce, yogurt, or ranch, that she had to place objects in her mouth, and that he gave H.W. emoji rings as rewards. Beeler asks us to discount only one portion of H.W.'s story: precisely what it was that he placed in her mouth. Given the facts

and circumstances, and that Beeler only asks us to discount a small portion of H.W.'s story, we do not believe that the evidence presented was so unbelievable, incredible, or improbable that no reasonable person could ever reach a guilty verdict based upon it.

[23] Because the evidence in this matter is not incredibly dubious, and because we are not free to reweigh the evidence or judge credibility on appeal, we cannot conclude that the evidence presented in this matter was insufficient.

## II. *Abuse of Discretion in Sentencing*

[24] The trial court abuses its discretion only if its sentencing decision is "clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom." *Anglemyer v. State,* 868 N.E.2d 482, 490 (Ind. 2007). A trial court abuses its discretion by: (1) failing to enter a sentencing statement, (2) finding aggravating or mitigating factors unsupported by the record, (3) omitting mitigating factors clearly supported by the record and advanced for consideration, or (4) giving reasons that are improper as a matter of law. *Id.* at 490-91. Beeler's conviction carries a sentence of between twenty and forty years with the advisory sentence being thirty years. Ind. Code § 35-50-2-4(b).

[25] Beeler argues that his thirty-year sentence to the DOC is excessive in light of his minimal criminal record. The trial court stated that it considered Beeler's position of trust with children at the daycare as an aggravating factor and his

relative lack of criminal history as a mitigating factor.[1] The trial court balanced these aggravating and mitigating factors equally, sentencing Beeler to the advisory sentence of thirty years. The trial court also made clear, after Beeler's arguments to the contrary, that it was not punishing him for exercising his constitutional right to a trial.

[26] Beeler raises many arguments that the thirty-year sentence was an abuse of discretion. He argues that the trial court's consideration of "substantially uncorroborated testimony of the victim given the allegations in this case constituted reasons that are improper as a matter of law." Appellant's Br. p. 12. Specifically, he argues that the trial court should not have found H.W.'s testimony to be more credible than his denials and reiterates that the evidence in the matter was incredibly dubious. We have already concluded that the evidence presented was not incredibly dubious, and we are not free to reweigh the evidence on appeal. We also do not see any evidence or statements by the court that it sentenced him for acts other than that for which he was convicted. As such, we do not conclude that the trial court abused its discretion when sentencing Beeler.

## Conclusion

[27] Because the State presented sufficient evidence, and because the evidence was not incredibly dubious, we do not set aside Beeler's conviction. We also

---

[1] Beeler's only prior offense was a driving offense that is twenty-six years old.

conclude that Beeler's thirty-year sentence to the DOC was not an abuse of discretion.

[28] Affirmed.

Vaidik, C.J., and Crone, J., concur.