## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 20 2020, 9:01 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Thomas C. Allen
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Tina L. Mann
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Kattia Tarnow, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | October 20, 2020 <br><br> Court of Appeals Case No. 19A-CR-2972 <br><br> Appeal from the DeKalb Circuit Court <br><br> The Honorable Kurt Grimm, Judge <br><br> The Honorable Lisa M. Bowen-Slaven, Special Judge <br><br> Trial Court Cause No. 17C01-1608-F5-57 |

**Altice, Judge.**

# Case Summary

This case presents an intriguing story of wealth, greed, promises, and deception. Over the course of a decade, Mark Souder, M.D. (Souder) provided money, he claims up to $500,000, to Kattia Tarnow for a specified purpose, namely for Tarnow to use to secure her inheritance from her deceased father's multi-million-dollar Costa Rican estate, a portion of which Tarnow agreed to pay Souder in exchange for his financial assistance. Tarnow never paid any money to Souder, and the State charged Tarnow with Level 5 felony theft for exerting unauthorized control over Souder's money. A jury found Tarnow guilty of Level 6 felony theft, and she appeals, asserting that the State presented insufficient evidence to convict her.

We affirm.

# Facts & Procedural History

According to Tarnow, her father (Hector) died, without a will, in Costa Rica in 2003. He had five children from two marriages, and all of the children besides Tarnow still resided in Costa Rica at the time of Hector's death. When he died, Hector owned a large parcel of extremely valuable oceanfront real property in Costa Rica. The property was "title of the crown" property, meaning it was originally deeded to Hector's family from Spain. *Transcript Vol. II* at 202, *Vol. III* at 25. Although Tarnow's mother and Hector had been separated for twenty years, they were still married when Hector died. A drawn-out estate settlement process ensued, the extent of which is fact or fiction is not clear.

[4] In 2005, a mutual friend introduced Tarnow to Souder. Tarnow told Souder that she was having trouble settling her father's estate, which she told him was valued at $70-80 million, and she asked Souder if he knew anyone who could help her financially with the costs associated with securing her share of the estate. Souder, in turn, introduced Tarnow to Dean Kruse, a local businessman, who for a period of time loaned money to Tarnow to help her deal with the estate and secure her inheritance, but he quit doing so when that business relationship soured.[1] Another friend of Tarnow's, Kristine White, who was a local real estate agent, was also providing credit cards and money to Tarnow around this same time.[2]

[5] In 2006, Souder began to function as a "consultant and advisor" to Tarnow and her family in settling the estate.[3] *Exhibits Vol.* at 119. In 2007, Souder began providing money to Tarnow to help her to obtain her share of her father's estate. In return, Tarnow told Souder that she would pay him a share of her inheritance once she received it; Souder and Tarnow both referred to this as "the deal." *See, e.g.*, *Transcript Vol. I* at 120, *Vol. III* at 27, 40, 49. Tarnow estimated to Souder that the costs that he would need to cover would be around

---

[1] Kruse and Tarnow partnered to form an entity to auction (the auction) some commercial real estate in Costa Rica, unrelated to Tarnow's father's estate, but the venture failed and purportedly both Tarnow and Kruse lost money. Souder was present for the auction and participated as an unpaid "consultant" but had no official role in it. *Transcript Vol. 2* at 115.

[2] Tarnow and her husband filed bankruptcy in 2008 and listed as a debt $60,000 owed to White. The debt was discharged in the bankruptcy.

[3] Additionally, Souder became the primary care physician to Tarnow, her husband, and several of her family members.

$2800 quarterly – for things such as taxes, document stamps, attorney's fees, government licensing, insurance, and travel. Over time, however, Tarnow asked Souder for money every couple of weeks to eventually almost daily, and often the requests were presented as being urgent in order to complete some task. The amount that Tarnow agreed to pay Souder began at around $5 million but increased over time as the value of the estate allegedly increased from $80 million to $140 million to over $200 million in 2014 and 2015. Tarnow told Souder that the estate sold in 2011 for upwards of $200 million and that the funds were held up in a Costa Rican bank, but Souder never saw documentation of any money in an account. In August 2014, Tarnow sent an email to Souder outlining various terms of the deal and reflecting that Souder was to receive approximately $41 million for his part in helping Tarnow.

[6] Souder provided money to Tarnow in a number of ways, including handing cash directly to Tarnow or her husband, giving money to White to deliver to Tarnow, and electronically transferring money from Souder's various bank accounts in Allen and Dekalb counties into the bank account of Tarnow's husband. He also wired money through MoneyGrams or Western Union. Tarnow made periodic trips to Costa Rica and told Souder that the trips were "necessary" for her to complete transactions on the deal. *Transcript Vol. 2* at 125. When he would ask for receipts, Tarnow gave him "a variety of excuses" such as "they don't give you a receipt." *Id*. at 146.

[7] At some point, Souder spoke to a detective that he knew with the Indiana State Police (ISP) regarding Tarnow and his financial arrangement with her, and, in

April 2015, another detective, Detective Jacob Quick, followed up with Souder to begin an investigation. However, Souder expressed that he believed in the deal and did not want Detective Quick to investigate or interview others about the matter. A few months later, Detective Quick spoke with Souder again, and Souder was still not willing to move forward with further investigation.

[8] In December 2015, Souder met with Detective Quick again and expressed concern about the possibility that the deal was a scam. During their meeting, Tarnow happened to call Souder. Their conversation was on speaker, and the detective heard the conversation. Tarnow asked for more money to secure the deal and stated it would be the last time she would ask for money. Detective Quick spoke with Souder again in January 2016, but Souder was still not willing to cooperate.

[9] After speaking with the county prosecutor, Detective Quick contacted Souder in February 2016, advising him that he was reopening the investigation. In March 2016, Souder stated he was ready to move forward. A review of Souder's bank records for 2015 showed 92 transfers of money from Souder to Tarnow's joint accounts with her husband totaling $101,369.

[10] Detective Quick met with Tarnow and her husband on March 3, 2016 at their residence in Fort Wayne, although Tarnow had told Souder that she was in Costa Rica working on the estate. Detective Quick met with them again on March 4, 2016 at the Auburn Police Department (APD), and he met with Tarnow, alone, on March 8 at APD for a recorded interview. Within a week or

two of talking to Detective Quick, Souder had two phone calls with Tarnow that he recorded and provided to law enforcement.

[11] On August 29, 2016, the State charged Tarnow with Level 5 felony theft, alleging that between August 2014 and November 2015, Tarnow "knowingly or intentionally exerted unauthorized control over property of another person, that being [Souder]'s US Currency ($ 151,238.15), with intent to deprive the other person of any part of its value or use, and [] the value of the property is at least fifty thousand dollars ($50,000)." *Appellant's Appendix Vol. II* at 21.

[12] A four-day jury trial was held in October 2019. At trial, the State presented the testimony of Souder, White, Kruse, and Detective Quick. Tarnow testified in her defense, and she presented the testimony of her husband, family members, and two friends, who had either known Hector or visited his property in Costa Rica.

[13] White testified that between 2007 and 2010, she loaned credit cards and money to Tarnow with the expectation that Tarnow would pay her back once she received the inheritance and that she lost $93,000. Kruse stated that he was introduced to Tarnow by Souder because he was someone with money who could help Tarnow to obtain the inheritance, which Kruse did with the expectation that he would receive $14 million. Kruse testified that he used his company jet to fly Tarnow, Souder, and himself to Costa Rica on four or five occasions to look at the property and talk to real estate brokers and lawyers. Kruse stated that he negotiated a sale in which Tarnow's aunt, who he never

met, agreed to purchase the property for $175 million, but she took a trip to Spain and died there. He testified that he stopped providing funds to Tarnow in 2010 but Souder continued to do so.

[14] Souder testified that in total he loaned between $350,000 and $500,000 to Tarnow solely for her to use to obtain her share of her father's estate, but he was able to document through bank records only $101,369. Although he loaned her credit cards, Souder never authorized Tarnow to use the cards for her personal expenses or gambling. Souder testified that he never received any money from Tarnow. Souder stated that he did not initially cooperate with an investigation because he was still under the "illusion" that Tarnow could produce on "the promises that she had made." *Transcript Vol. 1* at 149. Once he did agree to move forward, and after Detective Quick contacted the Tarnows, Tarnow called Souder and was "extremely angry" and threatened to leave the country and kill herself. *Id*. at 151.

[15] Souder's two recorded phone calls with Tarnow were admitted into evidence. Tarnow acknowledged that she had not told Souder "all the truth" but blamed her family and circumstances for not being able to do so, and she blamed Souder for destroying her life and taking "everything away from me over money." *Id*. at 157, 161. She acknowledged, "I understand that I have done a lot of things wrong. I know that." *Id*. at 158. He told her, "I trusted everything you said," and she replied, "I know you did, Mark. I'm sorry I let you down." *Id* at 160-61.

[16] Detective Quick also testified, and video recordings of his March 8, 2016 interview with Tarnow were admitted into evidence. In the interview, Tarnow told Detective Quick that Souder had given her money and credit cards but stated a number of times that she never asked for any of it. She estimated receiving around $500,000 from Souder and using around $300,000 for the deal. She told Detective Quick that Souder had told her she could use the cards for whatever she needed. Tarnow said that the property sold to a cousin in 2011 for $217 million and that Souder was to receive his portion "as soon as we finish it." *Transcript Vol. II* at 60. When asked for the account number of the Costa Rican bank where the funds were, Tarnow stated that she did not have it with her. She initially said that she was the family member in control of the estate but later said, "I am not anymore" and that her sister was, but she did not have her sister's telephone number to give to Detective Quick. *Id*. at 101. Tarnow also shared with Detective Quick, "I have been winning money at the casinos. A lot of money at the casinos[,]" specifically $217,000 "over the [] past two years." *Id*. at 62. Tarnow mentioned owing people money in Costa Rica related to the failed auction.

[17] Tarnow testified in her defense. Her position was that Souder was helping her with the estate and that, in the beginning, "everything was okay" but then Souder became possessive and controlling, stalked her, and pressured her to get the money from the estate. *Transcript Vol. III* at 27. She testified that Souder gave her credit cards and money and told her that if there was money left after the necessary expenses, she could use the money for "whatever [she] want[ed],"

including gambling. *Id*. at 79. She acknowledged that she did use "[s]ome" of Souder's money for gambling. *Id.*

[18] The State urged in closing argument that this was, in large part, "a crazy fairytale" that Tarnow concocted and Souder believed for whatever reason; defense counsel argued that Souder was using Tarnow to profit from the estate transaction. *Id.* at 147. The jury found Tarnow guilty of Level 6 felony theft.[4] She now appeals. Additional information will be provided below as needed.

## Discussion & Decision

[19] When reviewing challenges to the sufficiency of the evidence, we do not reweigh the evidence or judge the credibility of the witnesses. *Robinson v. State*, 56 N.E.3d 652, 657 (Ind. Ct. App. 2016), *trans. denied*. We consider only the evidence most favorable to the verdict and the reasonable inferences drawn therefrom, and we will affirm if the evidence and those inferences constitute substantial evidence of probative value to support the verdict. *Id*. Reversal is appropriate only when a reasonable trier of fact would not be able to form inferences as to each material element of the offense. *Bond v. State*, 925 N.E.2d 773, 781 (Ind. Ct. App. 2010), *trans. denied*.

[20] The State charged Tarnow with Level 5 felony theft, alleging that she "knowingly or intentionally exerted unauthorized control over property of

---

[4] The trial court sentenced her to one and one-half years, with one year suspended to probation and the remaining six months to be served in community corrections.

another person, that being [Souder]'s US Currency ($151,238.15), with intent to deprive the other person of any part of its value or use, and (A) the value of the property is at least fifty thousand dollars ($50,000)." *Appellant's Appendix Vol. II* at 21. The jury found her guilty of Level 6 felony theft, for which the State was required to prove that the value was at least $750 and less than $50,000. Ind. Code § 35-43-4-2(a)(1)(A). A defendant's control is unauthorized if, among other things, it was exerted in a manner or to an extent other than that to which the other person had consented; by creating or confirming a false impression in the other person; or by promising performance that the defendant knows will not be performed. I.C. § 35-43-4-1(b)(2), (4), (6).

[21] Tarnow does not dispute the evidence of the many transfers of money from Souder, and she agrees that the transfers were in excess of $50,000 as originally charged and were for the purpose of "prosecution of" her Father's estate. *Appellant's Brief* at 20. Rather, her argument is that the evidence shows that "the prosecution of the estate was a legitimate endeavor and not a scam" and, therefore, she did not create or confirm a false impression in Souder that he would receive a portion of her inheritance. *Id.* at 21. We disagree.

[22] From the beginning of their business deal, Tarnow told Souder that she would give him millions, eventually reaching $40 million, if he funded the costs she would incur in settling her father's estate that, according to her, ranged in value from $70 million to eventually over $200 million. Tarnow represented to him that she was the family member in charge of the transaction although when he later began pressing her for details and documentation, she told him her cousin

had taken over the estate matter. Tarnow told Souder that the property sold in 2011 and that the funds were tied up in a Costa Rican bank account, but she did not produce documentation of such an account and she continued to ask Souder for money for expenses to settle the estate. At one or more times, she told him she was in Costa Rica when she was in Indiana; another time, she texted him that she was in Nicaragua when she was in Italy. She acknowledged making charges on Souder-provided credit cards while in European countries.

[23] When she learned that Souder was speaking to authorities, she told Souder that she was going to flee the country and/or kill herself. Tarnow blamed him for the situation, stating, for instance, "You wanted to continue to give me money, and give me money, and give me money when I tell you I don't want to continue to do it." *Transcript Vol. I* at 162. By the end of the call, Souder was apologizing to her. *See id*. In the next call, Tarnow told Souder that he was going to lose his medical license related to treatment rendered to her and her family, that his "fat ass[]" kids did not love him, and that karma would get him. *Id*. at 172. The tone of the recorded phone calls between Souder and Tarnow reflects Tarnow's ability to manipulate Souder. We find that the State presented sufficient evidence from which the jury could conclude that Tarnow knowingly or intentionally created a false impression in Souder that he would receive a portion of the estate.

[24] With regard to whether Tarnow's use of Souder's money was unauthorized because she used it for a purpose other than that consented to, specifically gambling, Tarnow argues that the jury's conclusion that she did not have

permission to use the money for gambling "is unreasonable" given that she testified that Souder was aware that she used some of the money for gambling. *Appellant's Brief* at 21. Tarnow's argument is simply a request to reweigh the evidence. Souder testified that he loaned money to Tarnow only for the purpose of getting her share of the inheritance and that he did not authorize her to gamble with it. That Tarnow testified otherwise meant only that the jury was presented with conflicting evidence that it had to weigh. The jury chose to believe Souder.

[25] The State presented sufficient evidence to convict Tarnow of Level 6 felony theft.

[26] Judgment affirmed.

Riley, J. and May, J., concur.